# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MICKEY DOLLENS, on behalf of himself and all other similarly situated Class A stockholders of Goosehead Insurance, Inc.,

Plaintiff,

v.

GOOSEHEAD INSURANCE, INC.,

Defendant.

C.A. No. 2022-1018-JTL

## OPINION APPROVING SETTLEMENT

Date Submitted: March 24, 2026
Date Decided: June 30, 2026

Thomas Curry, SAXENA WHITE P.A., Wilmington, Delaware; David Wales, SAXENA WHITE P.A., White Plains, New York; Adam Warden, SAXENA WHITE P.A., Boca Raton, Florida; Francis A. Bottini, Jr., BOTTINI & BOTTINI, INC., La Jolla, California; *Attorneys for Plaintiff*.

Blake Rohrbacher, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Gary A. Bornstein, Justin C. Clarke, CRAVATH, SWAINE & MOORE, LLP, New York, New York; *Attorneys for Defendant*.

**LASTER, V.C.**

The parties presented a class-action settlement for approval. The court raised concerns about whether the settlement attempted to validate provisions that were incurably void ab initio and thus beyond the court's power to bless. The parties agreed to provide supplemental briefing on that question.

Meanwhile, the court issued decisions addressing related issues. Rulings in *Moelis Justiciability*,[1] *Moelis Merits*,[2] *Wagner Chancery*,[3] and *Seavitt*[4] reinforced the possibility that the settlement attempted to validate provisions that were incurably void. The parties agreed to stay the case until the Delaware Supreme Court ruled in *Moelis*.

*Moelis Justiciability* held that if the challenged provisions in a governance agreement facially violated Section 141(a) of the Delaware General Corporation Law (the "DGCL"), then they were incurably void. That in turn meant that affirmative defenses like laches could not validate the provisions. The laches defense and the voidness analysis were inextricably linked.

---

[1] *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985 (Del. Ch. 2024), *rev'd*, — A.3d —, 2026 WL 184868 (Del. Jan. 20, 2026).

[2] *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809 (Del. Ch. 2024).

[3] *Wagner v. BRP Gp., Inc.*, 316 A.3d 826 (Del. Ch. 2024), *rev'd and remanded*, — A.3d —, 2026 WL 1256588 (Del. May 7, 2026).

[4] *Seavitt v. N-Able, Inc.*, 321 A.3d 516 (Del. Ch. 2024).

*Moelis Merits* held that many, but not all, of the challenged provisions in a governance agreement were incurably void. A suite of eighteen pre-approval requirements violated Section 141(a). Provisions purporting to impose affirmative obligations on the board of directors also violated Section 141(a).[5] *Wagner Chancery* and *Seavitt* considered similar provisions and reached the same conclusions under Section 141(a) while also holding that specific pre-approval requirements violated Sections 142, 242, 251, 279, and 280.

In *Moelis Supreme*,[6] the Delaware Supreme Court reversed *Moelis Justiciability* as to laches. In doing so, the decision declined to address whether any of the challenged provisions violated Section 141(a).[7]

---

[5] *Moelis Merits* held that a provision that empowered the contractual counterparty to have its director designees placed on committees (the "Committee Composition Provision") also violated Section 141(c) of the DGCL, which empowers the board to establish, empower, and populate committees. *See Moelis Merits*, 311 A.3d at 876–77 (holding the Committee Composition Provision void as conflicting with Section 141(c)).

[6] *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, — A.3d —, 2026 WL 184868 (Del. Jan. 20, 2026). *Moelis Supreme* did not address the Committee Composition Provision, noting that the counterparty had waived its right to exercise the provision to accommodate stock exchange rules for non-controlled companies. *See id.* at *3.

[7] In the interim, the General Assembly enacted Section 122(18) of the DGCL. 8 *Del. C.* § 122(18) (the "Governance Agreement Amendment"). That statute broadly validated provisions in governance agreements like those at issue in *Moelis, Wagner, Seavitt*, and this case "[n]otwithstanding § 141(a)." *Id.* The statute carved out civil actions pending on or before its effective date. *See* Del. S.B. 313, 152d Gen. Assem. § 6 (2024). The Governance Agreement Amendment therefore did not affect *Moelis, Wagner, Seavitt*, or this case.

Instead, *Moelis Supreme* held that *if* the challenged provisions violated Section 141(a), *then* they still were not void. In reaching that holding, *Moelis Supreme* established a new test for voidness that turns on whether the corporation could have accomplished its goal by any means permissible under the DGCL. That new test looks to whether the corporation hypothetically could have achieved the result it sought. In a tip of the hat to the longstanding doctrine of independent legal significance, the new test can be thought of as the doctrine of hypothetical legal significance.

*Moelis Supreme* reasoned that even if the challenged provisions in the governance agreement violated Section 141(a), all of them could have been implemented validly through hypothetical provisions in the corporation's charter. They were therefore voidable rather than void. A voidable act is provisionally effective but subject to challenge and potential annulment. A corporation can invoke affirmative defenses to defeat a challenge. A voidable provision can also be fixed through ratification or other means.

Once the challenged provisions were not incurably void but provisionally effective albeit voidable, defensible, or fixable, then the corporation could rely on its affirmative defenses. *Moelis Supreme* held that the affirmative defense of laches barred the plaintiff's challenge.

The doctrine of hypothetical legal significance makes welcome changes to voidness law. Incurable voidness has created serious problems for Delaware corporations and their advisors. Not only is the original act incurably void, but the

3

original act's voidness can have a domino effect on later acts.[8] For that reason, I have previously argued (unsuccessfully) against expanding the categories of void acts.[9] The new doctrine of hypothetical legal significance curtails the scope of incurable voidness.

In light of *Moelis Supreme*, the parties presented the settlement again. With *Moelis Supreme* providing the governing test, there is no voidness-related impediment to approval.

In its place, a different concern arises. Under *Moelis Supreme*, the complaint was not meritorious when filed and therefore could not support a settlement. But in *Wagner Supreme*,[10] the Delaware Supreme Court rejected that argument, acknowledged that *Moelis Supreme* changed the law on voidness, and held that the complaint in *Wagner Chancery* was meritorious when filed.[11] The same reasoning applies here.

---

[8] *See* C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts*, 69 Bus. Law. 393, 402 (2014) (describing domino effect); *Olson v. EV3*, 2011 WL 704409, at *14–15 (Del. Ch. Feb. 21, 2011) (same).

[9] *See XRI Inv. Hldgs. LLC v. Holifield* (*XRI Trial*), 283 A.3d 581, 645–68 (Del. Ch. 2022) (arguing against incurable contractual voidness), *aff'd in part, rev'd in part on other grounds and remanded*, 304 A.3d 896 (Del. 2023). Although my efforts fell short, the General Assembly has since abrogated the concept of incurable contractual voidness. *See* 85 Del. Laws ch. 47, § 2 (2025).

[10] *Wagner v. BRP Gp., Inc.*, — A.3d —, 2026 WL 1256588 (Del. May 7, 2026).

[11] *Id.* at *2.

With those issues addressed, the settlement can be approved. The putative class meets the requirements for certification under Rules 23(b)(1) and (b)(2). The parties gave notice of the settlement in compliance with Rule 23 and in a manner that satisfies due process. The outcome falls within a range of reasonableness. Plaintiff's counsel is awarded an all-in fee of $950,000, which the defendant does not oppose. From that award, plaintiff's counsel may pay an incentive award of $5,000 to the named plaintiff.

## I.     FACTUAL BACKGROUND

The facts are drawn from the complaint, the documents it incorporates by reference, and the materials presented in support of the settlement.[12] A motion to approve a settlement calls for assessing the strengths and weaknesses of the claims asserted in light of the record the parties have created. When making that assessment, "in most instances, the court is constrained by the absence of a truly adversarial process, since inevitably both sides support the settlement and legally assisted objectors are rare. Thus, the facts stated hereafter represent the court's effort to understand the context of the motion . . . , but do not deserve the respect that judicial findings after trial are customarily accorded."[13]

---

[12] Citations in the form "Compl. Ex. ___ at ___" refer to exhibits to the complaint. Dkt. 5. Citations in the form "Stipulation Ex. ___ at ___" refer to exhibits to the Stipulation of Compromise and Settlement. Dkt. 13.

[13] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 961 (Del. Ch. 1996).

## A.  The Company And Its IPO

In 2003, Mark and Robyn Jones co-founded an insurance business. They conducted the business through Goosehead Financial, LLC (the "LLC"). A handful of other parties also owned equity in the LLC (together with the founders, the "Holders").

In April 2018, the Holders took the LLC public. Before the initial public offering, they formed Goosehead Insurance, Inc. ("Pubco") to serve as the publicly traded vehicle. After the IPO, Pubco would operate as a holding company; its sole material asset would be a controlling ownership interest in the LLC.

On April 27, 2018, Pubco completed its initial public offering. Pubco has a dual-class capital structure, but not a high-vote, low-vote structure. Under Pubco's amended and restated certificate of incorporation (the "Pubco Charter"), shares of both Class A and Class B common stock carry one vote per share on all matters on which stockholders generally are entitled to vote.

In the IPO, public stockholders received Class A shares. Since then, Pubco's Class A common stock has traded on NASDAQ under the ticker symbol "GSHD." The Holders received Class B shares.

## B.  The Governance Agreement

In connection with the IPO, the Holders and Pubco entered into a stockholders agreement dated as of May 1, 2018. Although portrayed as an agreement among stockholders, the agreement was a governance arrangement under which the Holders

6

secured a suite of governance rights that they could enforce against Pubco (the "Pubco Agreement").

The governance rights survive so long as the Holders meet the "Substantial Ownership Requirement." That term means the beneficial ownership of "at least ten percent (10%) of the issued and outstanding shares of Common Stock."[14] That provision allows the Holders to sell down after the IPO and generate liquidity for themselves without giving up control over Pubco.

The governance rights fall into two categories: (i) pre-approval requirements and (ii) board composition rights.

The pre-approval requirements require the Holders' approval before the board of directors can act (the "Pubco Pre-Approval Requirements"). The operative language states:

> *Approval for Certain Corporate Actions.* Until the Substantial Ownership Requirement is no longer met, Pubco shall not permit the occurrence of the following matters relating to Pubco without first receiving the approval of the Holders holding a majority of the shares of Class B Common Stock held by the Holders as evidenced by a written resolution or consent in lieu thereof:
>
> (a) any transaction or series of related transactions resulting in the merger, consolidation or sale of all, or substantially all, of the assets of the Company and its subsidiaries, or any acquisition or disposition of any asset for consideration in excess of 15% of the Total Assets . . . of Pubco and its subsidiaries;
>
> (b) any issuance of equity securities, or any other ownership interests, of Pubco or any of its subsidiaries, other than under any equity incentive

---

[14] Compl. Ex. A § 4.02(d).

plan that has received the prior approval of the Board of Directors, for consideration exceeding $50 million;

(c) any amendments to the certificate of incorporation or bylaws of Pubco;

(d) entering into any material new line of business (other than natural extensions of the business of Pubco and its subsidiaries) or making any material modification to the scope of Pubco's business;

(e) any change in the size of the Board of Directors;

(f) any hiring, termination, replacement, compensation, benefits or other significant decisions relating to the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, General Counsel or Controller, including entering into new employment agreements or modifying existing employment agreements, adopting or modifying any plans relating to any incentive securities or employee benefit plans or granting incentive securities or benefits to any such individuals under any existing plans; or

(g) any agreement or commitment with respect to any of the foregoing.[15]

Viewed in their totality, the Pubco Pre-Approval Requirements compel the board to obtain the Holders' prior written consent for a swath of actions that would otherwise fall within the board's plenary authority—including mergers and other significant transactions, charter and bylaw amendments, changes to the size of the board, and decisions regarding the hiring, termination, compensation, and benefits for Pubco's senior officers.

The board composition rights separately give the Holders rights over the composition of the board. The operative language states:

Until the Substantial Ownership Requirement is no longer met, the Holders holding a majority of the shares of Class B Common Stock held

---

[15] *Id.* § 1.01.

8

by the Holders may, by means of a written resolution or consent in lieu thereof, designate the nominees for a majority of the members of the Board of Directors, including the Chair of the Board of Directors.[16]

That singular provision contains two rights. The Holders have the right to designate a majority of the board (the "Pubco Board-Majority Right"). They also have the right to designate the board chair (the "Pubco Chair-Designation Right").

## C.    Post-IPO Events

Immediately after the IPO, the Holders controlled more than a majority of Pubco's total voting power. Since the IPO, they have sold shares to the point where they no longer hold a majority. Yet the Pubco Pre-Approval Requirements, Pubco Board-Majority Right, and Pubco Chair-Designation Right continue to give the Holders granular control over Pubco's business and affairs.

In September 2022, Pubco appointed Mark Jones, Jr.—the Jones' thirty-year-old son—as its Chief Financial Officer. In response, the trading price of the Class A shares fell by more than twenty-one percent in a single day. That drop eliminated more than $243 million in market capitalization.

## D.    The Litigation

The plaintiff has beneficially owned Class A stock since March 2022. After the appointment of Mark Jones, Jr. as Pubco's CFO, the plaintiff filed this putative class action on behalf of all Class A stockholders not affiliated with the Holders.

---

[16] *Id.* § 1.02.

The complaint contained three counts. Count I sought a declaration that the Pubco Pre-Approval Requirements violated Section 141(a) of the DGCL and were therefore incurably void. Count II sought similar relief for purposes of the Pubco Board-Majority Right and the Pubco Chair-Designation Right. Count III challenged the validity of a director-removal provision in the Pubco Charter. The plaintiff did not seek damages, only declaratory relief.

Pubco moved to dismiss the complaint. The parties agreed to defer briefing and engaged in settlement negotiations.

## E.     The Settlement

The parties reached a settlement based on modifications to the Pubco Pre-Approval Requirements and the Pubco Board-Majority Right. The parties did not make any changes to the Pubco Chair-Designation Right or the director-removal provision in the Pubco Charter.

### 1.     Amendments To The Pubco Pre-Approval Requirements

The settlement changed the Pubco Pre-Approval Requirements in two major ways. First, the modifications narrowed the categories of corporate action for which written pre-approval was required.

- The Pubco Pre-Approval Requirement for bylaw amendments now applies only to "Board of Directors-initiated amendments."

- The Pubco Pre-Approval Requirements for new lines of business now apply only to any "material new line of business . . . that is not similar, ancillary, complementary or related to, or a reasonable extension, development or expansion of Pubco's existing business activities."

- The Pubco Pre-Approval Requirements for decisions concerning senior officers remove hiring, termination, replacement, "entering into new employment

10

agreements or modifying existing employment agreements," and "other significant decisions" from the list.

The scope of the other Pubco Pre-Approval Requirements remains the same.

Second, the settlement added a fiduciary-out that covers all of the Pubco Pre-Approval Requirements. It states:

> For the avoidance of doubt, this Section shall not prevent Pubco from taking any of the actions set forth in any of the foregoing subsections (a)–(g) in the event that the Board of Directors should reasonably determine that permitting such action without first receiving the approval of the Holders holding a majority of the shares of Class B Common Stock held by the Holders is necessary to comply with its fiduciary duties under Delaware law.[17]

The modification introduced a notice-and-comment procedure before the board could invoke the fiduciary-out. It states:

> If the Board of Directors determines to cause Pubco to take any action described in subsections (a)–(g) above without having received the approval contemplated by this Section, it shall provide the Holders with reasonable notice and a reasonable opportunity to be heard at a meeting of the Board of Directors before such action is authorized, unless the Board of Directors reasonably determines that doing otherwise is necessary to comply with its fiduciary duties under Delaware law.[18]

Although this provision created a path for the board to act in the face of opposition from the Holders, constraints remained. The contractual standard was tight, requiring that the board "reasonably determine" that action was "necessary to comply" with the directors' fiduciary duties under Delaware law. The Holders could

---

[17] Stipulation Ex. A § 1.01.

[18] *Id.*

11

litigate those points and whether they received "reasonable notice and a reasonable opportunity to be heard."

The modifications to the Pubco Pre-Approval Requirements therefore did not restore the flexibility that a disinterested and independent board majority would have under Section 141(a) of the DGCL and the business judgment rule. Instead, the Holders retained a subset of the pre-approval rights and could litigate the fiduciary-out under an objective test of reasonableness resembling enhanced scrutiny.[19]

### 2. Amendments To The Pubco Board-Majority Right

The settlement also modified the Pubco Board-Majority Right by adding the following language:

> *provided however*, that this provision shall be without prejudice to the rights of Pubco's other common stockholders to designate competing nominees in the manner provided for in Pubco's governing documents. The Board of Directors shall have no obligation to endorse or support the nominees designated by the Holders if the Board of Directors reasonably determines that declining such endorsement or support would be necessary to comply with its fiduciary duties under Delaware law.[20]

---

[19] *See, e.g.*, *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 382–83 (Del. 2024) (discussing enhanced scrutiny's test of reasonableness as applied to a change-of-control transaction); *Kellner v. AIM ImmunoTech Inc.*, 320 A.3d 239, 259–60 (Del. 2024) (describing enhanced scrutiny review as involving a reasonableness test); *In re Dura Medic Hldgs., Inc. Consol. Litig.*, 331 A.3d 796, 820–21 (Del. Ch. 2025) (discussing enhanced scrutiny's standard of reasonableness); *In re Columbia Pipeline Gp., Inc.*, 2021 WL 772562, at *30–31 (Del. Ch. Mar. 1, 2021) (same); *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 249–50 (Del. Ch. 2021) (same).

[20] Stipulation Ex. A § 1.02.

The modification made clear that (1) the Holders' designation right was not exclusive and (2) the directors were not contractually obligated to support or recommend the election of the Holders' nominees if their fiduciary duties required a different course. The Pubco Chair-Designation Right remained unchanged.

### 3. The Release

In exchange for the modifications to the Pubco Agreement, the plaintiff agreed to a release that only covered claims premised on the facial invalidity under Delaware law of (i) any provision of the Pubco Agreement as amended, (ii) the removal provision in the Pubco Charter, and (iii) nomination provisions in Pubco's bylaws. The release did not encompass fiduciary claims, as-applied claims, or claims challenging the facial validity of other provisions in the company's governing documents.

### 4. The Requested Fee And Incentive Awards

Plaintiff's counsel asked for an all-in award of attorneys' fees and expenses in the amount of $3,500,000. Plaintiff's counsel asked for leave to pay $5,000 of that amount to the named plaintiff as an incentive award. Counsel represented that lawyers and professional staff devoted 557 hours to the case, generating a lodestar of $426,239.25 and an average hourly rate of around $765.24. Plaintiff's counsel also represented that they incurred $4,630.56 in expenses.

Pubco opposed the fee award.

## F. The Settlement Hearing

On February 22, 2024, the parties presented the settlement for approval. Ten days before the hearing, the court decided *Moelis Justiciability*. During the hearing,

13

the court noted that plaintiff's counsel had filed other litigation, such as *Moelis* and *Seavitt*, challenging provisions in governance agreements as incurably void that were similar to those in the Pubco Agreement. The court observed that if those arguments prevailed, then some provisions that the settlement proposed to bless would be incurably void. The court asked counsel whether the court could approve a settlement if the provisions were indeed incurably void.[21]

The court also asked what would happen if the Delaware Supreme Court later held that provisions like those in the Pubco Agreement were incurably void. At that point, there would be a conflict between the principle of finality of judgments and the principle that nothing—including a court—could validate a void act.[22]

Counsel for both sides expressed uncertainty about the state of the law. After a recess, the court deferred ruling on the settlement and asked for supplemental briefing.[23] Although the court deferred its ruling, the court noted that without the voidness issue, it was a settlement that was "easy to approve" and where "the class is easy to certify."[24]

---

[21] Dkt. 36 at 11–12.

[22] *Id.* at 20–21 ("It's on the one hand res judicata coming head to head with, you know, statutory voidness. And, again, in terms of this Court's power, even contractual voidness is enough to blow it up. So you would think that statutory voidness would really blow it up.").

[23] *Id.* at 34.

[24] *Id.* at 33.

Before the parties submitted their supplemental briefs, the court issued *Moelis Merits*, *Wagner Chancery*, and *Seavitt*. Those decisions held that provisions like those in the Pubco Agreement were incurably void. After *Moelis Merits*, the parties agreed to stay further proceedings "pending the resolution of any appeal in [*Moelis*]."[25]

## G. Further Legal Developments

In *Moelis Supreme*, the Delaware Supreme Court reversed the laches ruling in *Moelis Justiciability*. The Delaware Supreme Court declined to address whether any of the challenged provisions violated Section 141(a), reasoning instead that if they did, then the provisions were not incurably void. Instead, they were voidable, meaning provisionally effective albeit subject to being challenged and annulled, successfully defended through affirmative defenses, or otherwise fixed. Because all of the challenged provisions were voidable, the proper invocation of a defense like laches could insulate them from challenge. *Moelis Supreme* held that laches barred the plaintiff's suit.

In *Wagner Supreme*, the Delaware Supreme Court reversed *Wagner Chancery*. The *Wagner* plaintiff conceded on appeal that all the provisions that *Wagner Chancery* found incurably void were instead voidable under the reasoning in *Moelis Supreme*.[26] The plaintiff thus conceded that a laches defense could insulate the

---

[25] Dkt. 41 at 2.

[26] They made this concession even though *Wagner Chancery* held that some of the provisions at issue in that case were void because they conflicted with provisions of the DGCL other than Section 141(a). *See Wagner Chancery*, 316 A.3d at 873–74

provisions from challenge. Relying on that concession, *Wagner Supreme* held that the doctrine of laches barred the plaintiff's challenge under the reasoning set out in *Moelis Supreme*.

But unlike in *Moelis*, the corporate defendant in *Wagner* (BRP Corporation) made changes to its governance agreement voluntarily after the *Wagner* plaintiff sued, while defending other provisions on the merits. BRP argued that under *Moelis Supreme*, the plaintiff's complaint was not meritorious when filed and could not support a fee award. The plaintiff responded that counsel could still recover a mootness fee for conferring benefits on BRP and its stockholders through the amendments to the governance agreement.

In *Wagner Supreme*, the justices implicitly acknowledged that *Moelis Supreme* adopted a new test, holding that "[a]t the time Wagner filed suit, she had a meritorious facial invalidity claim that certain stockholders agreement provisions

---

(holding Officer Pre-Approval Requirement void because of conflict with Section 142(b) and (e)); *id.* at 877 (holding Charter Pre-Approval Requirement void because of conflict with Section 242); *id.* at 877–78 (holding Transaction Pre-Approval Requirement void because of conflict with Section 251). That said, under the doctrine of hypothetical legal significance, the Officer Pre-Approval Requirement at issue in *Wagner* becomes voidable rather than void because, as *Wagner Chancery* acknowledged, the provision could validly appear in the charter or bylaws. *See id.* at 874. Not so with the Charter Pre-Approval Requirement or the Transaction Pre-Approval Requirement. But similar provisions appeared in the Moelis Agreement, and *Moelis Supreme* held broadly that nothing in the DGCL prevented those provisions from appearing in a charter under the authority provided by Section 102(b)(1). *See Moelis Supreme*, 2026 WL 184868, at *10.

16

were void."[27] The justices therefore remanded the case so that this court could craft a mootness fee.[28]

BRP moved for reargument, contending again that under *Moelis Supreme*, the complaint could not have been meritorious when filed. The Delaware Supreme Court denied the motion, finding it "without merit."[29]

## H.     The Resubmission Of The Settlement

After *Moelis Supreme*, the parties resubmitted the settlement.[30] Plaintiff's counsel argued that *Moelis Supreme* eliminated any concerns about voidness. Plaintiff's counsel agreed to reduce their requested all-in award to $950,000, and Pubco agreed not to oppose that request.[31]

## II.     LEGAL ANALYSIS

The settlement of a class action requires court approval.[32] "[T]he Court of Chancery must . . . play the role of fiduciary in its review of these settlements . . . ."[33]

---

[27] *Wagner Supreme*, 2026 WL 1256588, at *2 (citing *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 879 (Del. 1980) ("the meritoriousness determination should be made with reference to the state of the action at the time of filing")).

[28] *Id.*

[29] *BRP Gp., Inc. v. Wagner*, No. 80, 2025 (Del. June 8, 2026) (ORDER).

[30] Dkt. 46.

[31] Dkt. 48.

[32] *See* Ct. Ch. R. 23(f).

[33] *In re Resorts Int'l S'holders Litig. Appeals*, 570 A.2d 259, 266 (Del. 1990).

17

"The Court undertakes this task to protect the interests of the absent class members vis-a-vis the personal interests of the representative plaintiff and the plaintiff's counsel. Care must be taken in approving a class action settlement . . . to ensure the fiduciary nature of the action is respected, and that approval is consistent with due process."[34]

## A. Voidness

The pivotal issue for settlement approval is whether any of the provisions in the Pubco Agreement are incurably void. If so, then the court cannot approve the settlement, because not even a court can validate an incurably void act.[35]

### 1. The Trial Court's Analysis In *Moelis Justiciability* And *Moelis Merits*

In *Moelis*, a stockholder plaintiff challenged an agreement (the "Moelis Agreement") between Moelis & Company ("Moelis") and three entities controlled by the company's CEO, Chairman, and eponymous founder (collectively, "Partners"). The Moelis Agreement granted Partners expansive governance rights, and the

---

[34] *In re AMC Ent. Hldgs., Inc. S'holder Litig.*, 2023 WL 5165606, at *18 (Del. Ch. Aug. 11, 2023), *aff'd*, 319 A.3d 310 (Del. 2024).

[35] *XRI Trial*, 283 A.3d at 655 ("As with contracts that are void *ab initio*, corporate acts that are void *ab initio* historically could not be fixed."); *see STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 (Del. 1991) (explaining that a "court cannot imbue void stock with the attributes of valid shares"); *cf. E. J. Hollingsworth Co. v. Cesarini*, 129 A.2d 768, 769 (Del. Super. 1957) ("A voidable judgment is, of course, deemed valid until set aside; one which is void cannot be made good.").

plaintiff contended that a series of provisions violated Section 141(a) of the DGCL.[36] Moelis moved for summary judgment, arguing that laches barred the suit.

In *Moelis Justiciability*, the trial court denied the company's motion for summary judgment on the basis of laches, explaining that if the plaintiff established that the challenged provisions facially violated the DGCL and were therefore void, then laches could not apply.[37] It was and remains undisputed that equitable defenses, including laches, cannot validate void acts. The trial court concluded that "[g]iven the theory of the complaint," laches was "not an available defense."[38] The laches analysis merged with the merits of the voidness challenge.

In *Moelis Merits*, the trial court held that the Moelis Agreement was "part of the Company's internal governance agreement" and therefore "subject to Section 141(a)."[39] Having reached that conclusion, the trial court applied the test articulated in *Abercrombie v. Davies*[40] to determine whether the provisions in the Moelis

---

[36] 8 *Del. C.* § 141(a).

[37] The company also sought dismissal on the basis of ripeness, contending that the plaintiff sued too early. *Moelis Justiciability* rejected that argument as well. 310 A.3d at 1010.

[38] *Id.* at 994.

[39] *Moelis Merits*, 311 A.3d at 866; *see id.* at 857 ("A contract represents the external exercise of corporate power. Section 141(a) polices internal restrictions on a board's ability to authorize a corporation to exercise its corporate power. Section 141(a) applies to external contracts that seek to implement internal restrictions.").

[40] 123 A.2d 893 (Del. Ch. 1956), *rev'd in part on other grounds*, 130 A.2d 338 (Del. 1957).

Agreement violated Section 141(a). Under that test, a court asks whether the provision has "the effect of removing from [the] directors in a very substantial way their duty to use their own best judgment on management matters" or "tends to limit in a substantial way the freedom of director decisions on matters of management policy."[41] If it does, then the provision is void.

The trial court held that it could adjudicate the validity of the challenged provisions because the facts were undisputed and the only issues presented were questions of law.[42] *Moelis Merits* held that some of the challenged provisions in the Moelis Agreement were incurably void because they violated Section 141(a).

## 2. The Delaware Supreme Court's Analysis In *Moelis Supreme*

In *Moelis Supreme*, the Delaware Supreme Court reversed the laches ruling in *Moelis Justiciability*.[43] The decision emphasized that it was *not* addressing whether any of the challenged provisions conflicted with Section 141(a).[44] Instead, *Moelis*

---

[41] *Id.* at 899. Although the Delaware Supreme Court reversed *Abercrombie* in part on other grounds, subsequent Delaware Supreme Court decisions embraced the *Abercrombie* test. *See Quickturn Design Sys., Inc. v. Shapiro* (*Quickturn II*), 721 A.2d 1281, 1292 & n.44 (Del. 1998) (endorsing and applying *Abercrombie* test); *Grimes v. Donald* (*Grimes II*), 673 A.2d 1207, 1214 (Del. 1996) (same) (subsequent history omitted); *Mayer v. Adams*, 141 A.2d 458, 461 (Del. 1958) (citing *Abercrombie* with approval); *Adams v. Clearance Corp.*, 121 A.2d 302, 305 (Del. 1956) (endorsing *Abercrombie*'s analysis).

[42] *Moelis Justiciability*, 310 A.3d at 992.

[43] *Moelis Supreme*, 2026 WL 184868, at *4.

[44] *Id.* ("Because we agree with Moelis's timeliness argument, we need not address its contentions as to the facial validity of the challenged provisions."); *id.* at

20

*Supreme* held that *if* any of the provisions conflicted with Section 141(a), *then* they were not incurably void. Under that line of reasoning, it was not necessary to address whether any of the challenged provisions actually conflicted with Section 141(a).

To bolster the election not to address whether any of the challenged provisions conflicted with Section 141(a), *Moelis Supreme* noted that "[b]oth void and voidable contracts are unenforceable to one extent or another."[45] The different extents, however, matter significantly. A void act is incurably ineffective ab initio, i.e., from the outset. Because a void act is void under all circumstances, it is subject to facial challenge.

A voidable act is not invalid or unenforceable from the outset; it is valid until annulled.[46] It is thus provisionally effective, but subject to being invalidated by a

---

*6 ("But before discussing the cases we deem most helpful in untangling the knotty distinction between void and voidable contracts, we stress that, by drawing this distinction—one that has long vexed courts and legal scholars alike—we are not assessing the enforceability of the challenged provisions."); *id.* at *17 n.111 ("Because we have concluded that the plaintiff's complaint is barred by laches, we need not address the parties' respective contentions—and offer no opinion—as to the facial validity of the challenged provisions of the stockholders agreement.").

[45] *Id.* at *6.

[46] *See, e.g.*, *Griffin v. Coca-Cola Refreshments USA, Inc.*, 989 F.3d 923, 934 (11th Cir. 2021) ("If the assignments are void *ab initio* then there is no need to proceed to the equitable claims because each assignment is inherently null. On the other hand, if the assignments are merely voidable, then they are effective unless and until they are challenged."); *Depner v. Joseph Zukin Blouses*, 56 P.2d 574, 575 (Cal. Ct. App. 1936) ("A voidable act takes its full and proper legal effect unless and until it is disputed and set aside by some tribunal entitled to do so. 'Voidable' means subject to being avoided by judicial action of a court of adequate jurisdiction . . . . A voidable contract is one which may be rendered null at the option of one of the parties, but is

court, successfully defended in litigation, or fixed by ratification or another method. That in turn means that a voidable provision is generally not subject to facial challenge, precisely because it can be defended successfully in litigation or fixed by ratification or other means. For voidability, the facts usually matter.

By entering judgment based on laches, *Moelis Supreme* necessarily held that the challenged provisions were not facially invalid in the sense of being incurably void. Had they been incurably void, laches could not have applied.

### a.     The New Doctrine Of Hypothetical Legal Significance

In *Moelis Merits*, the court reasoned that "[i]f the Challenged Provisions violate § 141(a), then they are void."[47] *Moelis Supreme* disagreed, stating: "The premise of this conclusion—that a corporate action taken in a manner that is at odds with the

---

not void until so rendered."); *see also Noble v. Nat'l Mines Corp.*, 774 F.2d 144, 147 (6th Cir. 1985) ("That a transaction can be rescinded or avoided does not mean that it was void in the first instance. In fact, just the opposite is true. If the transaction is void from its inception, no formal action is required to negate it, since a void transaction has no legal force or effect."); *compare Void*, *Black's Law Dictionary* (12th ed. 2024) (defining void as "[o]f no legal effect; to null" and "void *ab initio*" as "[n]ull from the beginning, as from the first moment when a contract is entered into. A contract is void *ab initio* if it seriously offends law or public policy, in contrast to a contract that is merely voidable at the election of one party to the contract") *with Voidable, Black's Law Dictionary* (12th ed. 2024) (defining "voidable" as "[v]alid until annulled"). *See generally Stercula v. Wengert*, 2025 WL 1881783, at *3 (Del. Ch. July 8, 2025) (distinguishing between the "three vs"—valid, voidable, and void—in the context of deeds).

[47] *Moelis Supreme*, 2026 WL 184868, at *6 (quoting *Moelis Justiciability*, 310 A.3d at 994).

22

DGCL is necessarily void rather than voidable—is inconsistent with our cases that draw a distinction between void and voidable contractual provisions."[48]

*Moelis Supreme* then articulated the test it would apply to assess voidness, framing the inquiry using the test that governs the legality of third-party contracts. *Moelis Supreme* started from the principle that "not all contracts that conflict with positive law are void."[49] Elaborating, the decision stated:

> There are degrees of evil and illegality. Some bargains are said to be *malum in se*, while others are *malum prohibitum*. Those that are *malum in se*—that is, so malignantly bad that any party to it deserves no help from the law—are generally said to be void *ab initio*, while those that are merely *malum prohibitum* (relating to regulation) are often treated as voidable.[50]

For that proposition, *Moelis Supreme* cited the *Restatement (Second) of Contracts*,[51] *Corbin on Contracts*,[52] a law review article discussing the nature of void and voidable contracts,[53] and a decision in which I sought unsuccessfully to convince the justices

---

[48] *Id.*

[49] *Id.*

[50] *Id.* (cleaned up).

[51] *Id.* at *6 n.35 (citing Restatement (Second) of Contracts § 8 cmt a. (Am. L. Inst. 1981) ("Voidable contracts might be defined as one type of unenforceable contract.")).

[52] *Id.* at *6 n.37 (citing 3 Eric M. Holmes, Corbin on Contracts, § 9.27 (Joseph Perillo ed., rev. ed 1996)).

[53] *Id.* at *6 n.39 (citing Jesse A. Schaefer, Comment, *Beyond a Definition: Understanding the Nature of Void and Voidable Contracts*, 33 Campbell L. Rev. 193, 200–01 (2010)).

to reconsider the doctrine of incurable contractual voidness.[54] Those authorities accurately state the test for assessing the illegality of third-party contracts.

Before *Moelis Supreme*, Delaware courts had not used the concepts of *malum in se* and *malum prohibitum* to evaluate whether an internal corporate governance arrangement was void because it violated the DGCL. *Moelis Supreme* explained that those concepts were "implicit in our decisions that differentiate void from voidable contracts in the corporate-governance context."[55] Relying on its decision in *CompoSecure*, *Moelis Supreme* explained that "[t]he common law rule" recognized "that void acts are *ultra vires* and generally cannot be ratified, but voidable acts are acts falling within the power of a corporation, though not properly authorized, and

_____

[54] *Id.* at \*6 n.36 (citing *XRI Trial*, 283 A.3d at 652 n.60 ("Not all contracts that exceed the bounds of law are void ab initio.")).

[55] *Id.* at \*6 (citing *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 816–17 (Del. 2018), *abrogated in part by* 83 Del. Laws ch. 61, § 1 (2021) *and further abrogated by* 85 Del. Laws ch. 47, § 2 (2025)).

*CompoSecure* addressed whether a third-party sales agreement was incurably void because the entity's LLC agreement stated that any action falling within a category of "Restricted Activities" that did not receive specified approvals "shall be void and of no force or effect." *CompoSecure*, 206 A.3d at 814 (emphasis omitted). The trial court held that the license agreement was voidable. At oral argument, the justices asked whether the contractual specification of voidness would be a "game-changer" if the agreement fell within the scope of the restricted-activity provision. *Id.* at 816. The plaintiff's counsel agreed that it would be a game-changer, thereby accepting the premise that a contract's use of the term "void" carried the full implications of a common law determination that an act was void ab initio. *Id.*

24

are subject to equitable defenses."[56] Continuing with the concept of ultra vires, *Moelis Supreme* distinguished between "actions that are beyond the authority of corporate fiduciaries to take from actions that are *ultra vires* the corporation—that is, beyond the corporation's power to take."[57] *Moelis Supreme* encouraged readers "to remember that although *ultra vires* acts can in some contexts be defined broadly, in the context of defining void acts, *ultra vires* acts fall under a much more narrow definition which includes acts specifically prohibited by the corporation's charter, for which no implicit authority may be rationally surmised, or those acts contrary to basic principles of fiduciary law."[58]

Following the appellant's suggestion,[59] *Moelis Supreme* then looked to Vice Chancellor Parsons' decision in *Nevins* for a general rule, quoting that decision for the following proposition: "Void acts are illegal acts or acts beyond the authority of the corporation. In contrast, voidable acts are ratifiable because the corporation can

---

[56] *Moelis Supreme*, 2026 WL 184868, at *6 (quoting *CompoSecure,* 206 A.3d at 816–17). That statement is descriptively accurate, in the sense that if a decision has correctly held an act to be ratifiable, then it cannot be void. Likewise, if a decision has correctly held that an equitable defense can validate an act, then the act cannot be void. But *ex ante*, those factors do not help a court determine whether a particular defect renders an act incurably void ab initio as opposed to effective but voidable or fixable.

[57] *Id.* at *7.

[58] *Id.*

[59] *Moelis Supreme*, Case No. 340, 2024, Dkt. 10 at 16–17; Dkt. 24 at 3; Dkt. 38 at 12.

lawfully accomplish them if it does so in the appropriate manner."[60] *Nevins* involved the election of directors at a special meeting where the company gave only two-days' notice of the meeting rather than the ten-days' notice required under the bylaws. The company could have given bylaw-compliant notice.[61]

Adopting the appellant's framing, *Moelis Supreme* summarized the holding in *Nevins* as follows: "Because all the disputed actions taken at the meeting could have been accomplished lawfully by the defendants had they done them in the proper manner—that is, with proper notice—the actions were deemed voidable, not void, and therefore subject to the equitable defenses of laches and acquiescence."[62] *Moelis*

---

[60] *Moelis Supreme*, 2026 WL 184868, at *7 (quoting *Nevins v. Bryan*, 885 A.2d 233, 245 (Del. Ch.), *aff'd*, 884 A.2d 512 (Del. 2005)).

[61] *Nevins*, 885 A.2d at 246.

[62] *Moelis Supreme*, 2026 WL 184868, at *7. That statement is correct, but *Nevins* involved a procedural violation, not a substantive violation. Both by statute and under the common law, notice can be waived expressly or through conduct. *See* 8 *Del. C.* § 229 ("Whenever notice is required to be given under any provision of this chapter or the certificate of incorporation or bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened."); *Bryan v. W. Pac. R. Corp.*, 35 A.2d 909, 913 (Del. Ch. 1944) ("[I]t is elementary that in the absence of waiver, consent or estoppel, reasonable notice to stockholders entitled to vote is a prerequisite to the validity of a special meeting of stockholders."); *see generally* 5 Fletcher Cyc. Corp. § 2011, Westlaw (database updated Sept. 2025) (Objections to and defects in notice; waiver, estoppel and ratification). A challenge to notice therefore inherently requires analysis of waiver, acquiescence, and laches. It follows that notice-based challenges can only render an act voidable, not void. *Nevins* also involved a violation of a notice

26

*Supreme* then generalized that proposition to establish an overarching test for voidness:

> The question to be answered under this framework for distinguishing between void and voidable acts then is not whether the method actually chosen by the Moelis board to implement the challenged provisions was valid under the DGCL. Instead, we evaluate whether the plaintiff has demonstrated that there are no lawful means by which Moelis could accomplish its desired governance arrangements, making the challenged provisions susceptible to cure and therefore voidable.[63]

Under that test, if a corporation could have accomplished the same end by a different means than the one the corporation pursued, then the act is voidable, not void. Post-*Moelis Supreme*, that is the test for corporate voidness. Just as *Nevins* did not involve a governance agreement or a violation of Section 141(a), the *Moelis Supreme* test is not limited to governance agreements or violations of Section 141(a).

A central pillar of Delaware law has long been the "bedrock doctrine of independent legal significance."[64] Under that doctrine, "action taken in accordance with different sections of that law are acts of independent legal significance even though the end result may be the same under different sections."[65] "The mere fact

---

requirement in the bylaws, not the charter or the DGCL. Contravening a bylaw is not the same as contravening the charter or statute. *See XRI Trial*, 283 A.3d at 666–67. *Nevins* was thus a weak foundation for an overarching test for voidness, but a foundation *Moelis Supreme* used to good effect.

[63] *Moelis Supreme*, 2026 WL 184868, at *7.

[64] *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 970 (Del. Ch. 1989).

[65] *Orzeck v. Englehart*, 195 A.2d 375, 377 (Del. 1963).

that the result of actions taken under one section may be the same as the result of action taken under another section does not require that the legality of the result must be tested by the requirements of the second section."[66] Thus, an attempt to use a charter amendment to deprive preferred stock of accumulated dividends was "null and void,"[67] but that did not prevent a merger from extinguishing the accumulated dividends by converting the preferred stock into a different form of property.[68] Similarly, the reality that a sale of assets had the same effect as a merger did not support treating it as a *de facto* merger for purposes of appraisal rights.[69] The effect of the doctrine of independent legal significance is "to make it plain that the general theory of the Delaware Corporation Law is that action taken under one section of that law is legally independent, and its validity is not dependent upon, nor to be tested by

---

[66] *Id.*; *accord Fed. United Corp. v. Havender*, 11 A.2d 331, 338–39 (Del. 1940); *see* C. Stephen Bigler & Blake Rohrbacher, *Form or Substance? The Past, Present, and Future of the Doctrine of Independent Legal Significance*, 63 Bus. Law. 1, 4–5 (2007) (tracing the history of the doctrine to the reasoning in *Havender*).

[67] *Keller v. Wilson & Co.*, 190 A. 115, 125 (Del. 1936) ("We are of opinion, therefore, that the amendment of the corporate charter, in so far as it assumed to destroy the rights of the complainants to dividends accrued upon their stock up to the time of the accomplishment of the amendment, is null and void.").

[68] *Havender*, 11 A.2d at 340, 343–44 (distinguishing *Keller* as involving a charter amendment; rejecting trial court's view of the merger as effectively "a dissolution or termination of the business of the corporation" that would require distribution to preferred stockholders and permitting use of a merger to convert the preferred stock into a different form of property).

[69] *Hariton v. Arco Elec., Inc.*, 188 A.2d 123, 125 (Del. 1963); *see* Bigler & Rohrbacher, *supra*, at 8.

the requirements of other unrelated sections under which the same final result might be attained by different means."[70]

*Moelis Supreme* introduces a mirror-image concept that can be thought of as hypothetical legal significance. If a corporation could hypothetically have achieved a desired outcome under a different section of the DGCL than the section it used, then the act is voidable. It thus takes on legal significance, although not legal significance that is immune from challenge. To reiterate, a voidable act is provisionally effective until fixed or challenged, at which point a court can annul or uphold it.

### b. Hypothetical Legal Significance, The Board Power Exception, And Section 102(b)(1)

*Moelis Supreme* held that all the provisions in the Moelis Agreement could have been implemented through the corporation's charter. Including a provision in the charter solves a Section 141(a) problem, because then the board's powers and duties operate subject to that provision. In its entirety, Section 141(a) states:

> The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation.[71]

---

[70] *Orzeck*, 195 A.2d at 367.

[71] 8 *Del. C.* § 141(a).

Section 141(a) thus consists of a grant of authority followed by an exception. The first sentence gives the board nearly plenary authority over the business and affairs of the corporation "except as may be provided otherwise in this chapter or in its certificate of incorporation" (the "Board Power Exception").[72] The second sentence makes clear that once a limitation appears in the charter, then "the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation."

Under the Board Power Exception, *if* a provision appears in the charter, *then* it modifies the board's powers and duties and is not void.[73] *Moelis Supreme* takes a

---

[72] *Id.*

[73] *E.g.*, *Quickturn II*, 721 A.2d at 1291 ("Section 141(a) requires that any limitation on the board's authority be set out in the certificate of incorporation."); *Lehrman v. Cohen*, 222 A.2d 800, 808 (Del. 1966) ("It is settled, of course, as a general principle, that directors may not delegate their duty to manage the corporate enterprise. But there is no conflict with that principle where, as here, the delegation of duty, if any, is made not by the directors but by stockholder action under [Section] 141(a), via the certificate of incorporation."). For legal opinions elaborating on this point, *see Bank of Am. Corp.*, 2010 WL 4922444, at *33 (S.E.C. No-Action Letter Feb. 22, 2010) ("Significantly, if there is to be any variation from the mandate of Section 141(a) of the DGCL, it can only be as 'otherwise provided in this chapter or in its certificate of incorporation.'"(citation omitted)); *Citigroup Inc.*, 2006 WL 568681, at *41 (S.E.C. No-Action Letter Mar. 2, 2006) ("[T]he directors' managerial authority can be vested in persons who are not directors only through an amendment to the certificate of incorporation."); *Maytag Corp.*, 2005 WL 562499, at *38 (S.E.C. No-Action Letter Mar. 4, 2005) ("Nor can a contract other than the charter limit in a substantial way the freedom of directors' decisions on matters of management policy. This rule of law applies even if the provision at issue limits the board of directors' authority in only one respect." (citations and internal quotation marks omitted)); *Nw. Airlines Corp.*, 2001 WL 114960, at *8 (S.E.C. No-Action Letter Feb. 5, 2001)

more expansive approach: If a provision hypothetically *could* appear in the charter, then it does not impermissibly conflict with Section 141(a) and is not void. As long as the provision hypothetically *could* appear in the charter, the non-charter-based provision is provisionally effective albeit voidable, defensible, or fixable.

In its arguments on appeal, Moelis identified two paths for implementing the challenged provisions through its charter. One would be as express provisions under

("Significantly, if there is to be any variation from the mandate of 8 *Del. C.* § 141(a), it can only be as 'otherwise provided in this chapter or in [the] certificate of incorporation.'"(citation omitted)); *Salomon Inc.*, 1991 WL 176724, at *3 (S.E.C. No-Action Letter Feb. 12, 1991) ("Under Section 141(a) of the Delaware law, the directors may not delegate their duty to stockholders to manage the corporate enterprise except (i) in the case of close corporations and (ii) where the Company's certificate of incorporation specifically so provides.").

Section 102(b)(1). The other would be as special attributes of stock.[74] Although *Moelis*

*Supreme* cited the latter in passing,[75] the decision focused on the former.

Section 102(b)(1) states that a certificate of incorporation may contain:

> Any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders . . . if such provisions are not contrary to the laws of this State.[76]

By its terms, Section 102(b)(1) explicitly authorizes a provision "defining, limiting

and regulating the powers of . . . the directors." In *Salzberg*, the Delaware Supreme

---

[74] *See* 8 *Del. C.* § 102(a)(4) ("The certificate of incorporation shall also set forth a statement of the designations and the powers, preferences and rights, and the qualifications, limitations or restrictions thereof, which are permitted by § 151 of this title in respect of any class or classes of stock or any series of any class of stock of the corporation and the fixing of which by the certificate of incorporation is desired."); *id.* ("The certificate of incorporation shall also set forth . . . an express grant of such authority as it may then be desired to grant to the board of directors to fix by resolution or resolutions any thereof [i.e., powers, preferences and rights, and the qualifications, limitations or restrictions] that may be desired but which shall not be fixed by the certificate of incorporation."); *id.* § 104 (explaining that a certificate of designations when filed becomes part of the certificate of incorporation); *id.* § 151(a) (identifying the types of special attributes that stock can carry); *Colon v. Bumble, Inc.*, 305 A.3d 352, 360–62 (Del. Ch. 2023) (discussing special attributes of stock). It seems unlikely that the special attribute path could support the hypothetical legal significance of covenants requiring corporate or board action. *See Wagner Chancery*, 316 A.3d at 862 n.135 ("A counterparty also would not be able to secure covenants that bind the board through a preferred stock issuance.").

[75] *Moelis Supreme*, 2026 WL 184868, at *8–9 (noting that *Moelis Merits* observed that the corporation likely could have achieved most, but not all, of what the Moelis Agreement attempted to achieve by issuing stock with special attributes).

[76] 8 *Del. C.* § 102(b)(1).

Court interpreted Section 102(b)(1) as "broadly enabling," with the only limitation found in the phrase "if such provisions are not contrary to the laws of this State."[77]

In *Sterling,* the Delaware Supreme Court held that the phrase "not contrary to the laws of this State" means that a charter provision cannot "transgress a statutory enactment or a public policy settled by the common law or implicit in the General Corporation Law itself."[78] *Moelis Supreme* held that a charter provision will not "transgress a statutory enactment" if there is no "mandatory provision of the DGCL or other Delaware law that would stand in the way."[79]

Under this framework, a provision has hypothetical legal significance and is not void if it could be implemented in the charter under Section 102(b)(1). A provision passes muster under Section 102(b)(1) if it neither violates a mandatory provision of Delaware law nor violates Delaware public policy. Holding that a provision is voidable because it could hypothetically be implemented under Section 102(b)(1) necessarily

---

[77] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 115 (Del. 2020).

[78] *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 118 (Del. 1952), *quoted in Jones Apparel Gp., Inc. v. Maxwell Shoe Co., Inc.*, 883 A.2d 837, 843 (Del. Ch. 2004), *quoted in Moelis Supreme*, 2026 WL 184868, at *9. In *Manti*, the Delaware Supreme Court reiterated that the "public policy favoring private ordering" reflected in Section 102(b)(1) "allows a corporate charter to contain virtually any provision that is related to the corporation's governance," subject only to the requirement that it not be "contrary to the laws of this State." *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1217 (Del. 2021).

[79] *Moelis Supreme*, 2026 WL 184868, at *9–10.

means that (i) the provision does not violate a mandatory provision of Delaware law and (ii) does not violate public policy.

### c.      The Challenger's Burden

*Moelis Supreme* held that the plaintiff had to prove a negative by showing that the challenged provisions lacked hypothetical legal significance, but noted the absence of Delaware precedent on that point.[80] A void act has to be void under all circumstances, so cases historically treated it as an issue of law, not fact.[81]

---

[80] *See id.* at *9 & n.60 ("Nor have we found any Delaware precedent explicitly addressing this point.").

[81] *See Grimes v. Donald* (*Grimes I*)*,* 1995 WL 54441, at *7 (Del. Ch. Jan. 11, 1995) (Allen, C.) ("Whether these contracts do violate Section 141 is a question of law directly concerning the legal character of the contract and its effect upon the directors."), *aff'd, Grimes II*; *see also Boris v. Schaheen*, 2013 WL 6331287, at *13 (Del. Ch. Dec. 2, 2013) ("Two related questions of law are implicated here: (i) whether the DGCL requires a written instrument evidencing board approval to issue common stock; and (ii) whether, if a written instrument is required, the lack of such approval by written instrument renders the issued stock void or voidable."); *cf. Spielberg v. State*, 558 A.2d 291, 292 (Del. 1989) (addressing certified question regarding voidness of criminal statute as a question of law). *See generally Moelis Justiciability*, 310 A.3d at 1008–10 (explaining why voidness is a Berle I claim presenting an issue of law); 17B C.J.S. Contracts § 1031, Westlaw (database updated Apr. 2026) (Law or public policy violation by contract as law or fact question) ("A question of law arises in determining whether a contract is in contravention of public policy or is otherwise illegal or unenforceable." (footnotes omitted)); 5 Williston on Contracts § 12:2 (4th ed.), Westlaw (database updated May 2026) (Attempted classification of illegal bargains and those void as against public policy) (noting that "the question whether a particular bargain is illegal" is "a question ordinarily of law, rather than of fact"). Burdens of proof relate to issues of fact. *See Chilson v. Allstate Ins. Co.*, 979 A.2d 1078, 1086 n.32 (Del. 2009) (explaining that a burden of proof encompasses both the burden of producing evidence on a point and "the burden of persuading the trier of fact that the alleged fact is true" (cleaned up)).

34

Because the issue is one of law, *Moelis Supreme* can be understood as allocating the burden of advancing arguments. The challenger has the burden of providing persuasive reasons why hypothetical legal significance is not available. In practice, the corporation will have attempted to use a particular means to achieve its goal. The challenger must explain initially why that means does not work and may argue why obvious alternatives do not work. The proponent will respond and likely point to other hypothetical means. The challenger must ultimately explain why the corporation cannot achieve its desired result under any of those options.

## 3. Hypothetical Legal Significance And The Pre-Approval Requirements

*Moelis Supreme* used the concept of hypothetical legal significance to analyze provisions in the Moelis Agreement that required the Moelis board of directors to obtain Partners' prior written consent before taking eighteen different categories of action (the "Moelis Pre-Approval Requirements"). The operative language stated:

> So long as the Class B Condition is satisfied, the Board shall not authorize, approve or ratify any of the following actions or any plan with respect thereto without the prior approval (which approval may be in the form of an action by written consent) of [Moelis]:
>
> (i) any incurrence of indebtedness (other than inter-company indebtedness), in one transaction or a series of related transactions, by the Company or any of its Subsidiaries or Controlled Affiliates in an amount in excess of $20 million;
>
> (ii) any issuance by the Company or any of its Subsidiaries or Controlled Affiliates in any transaction or series of related transactions of equity or equity-related securities (other than preferred stock, which is addressed by Section 2.1(a)(iii) below) which would represent, after such issuance, or upon conversion, exchange or exercise, as the case may be, at least three percent (3%) of the total number of votes that may be cast in the election of directors of the Company if all issued and outstanding Class

35

A Shares were present and voted at a meeting held for such purpose . . . ;

(iii) the issuance of any preferred stock;

(iv) any equity or debt commitment to invest or investment or series of related equity or debt commitments to invest or investments by the Company . . . in an amount greater than $20 million;

(v) any entry by the Company or any of its Subsidiaries or Controlled Affiliates into a new line of business that requires an investment in excess of $20 million;

(vi) the adoption of a stockholder rights plan by the Company;

(vii) any removal or appointment of any officer of the Company that is, or would be, subject to Section 16 of the Exchange Act;

(viii) any amendment to the Certificate of Incorporation or By-Laws;

(ix) any amendment to the Partnership LP Agreement;

(x) the renaming of the Company;

(xi) the adoption of the Company's annual budget and business plans and any material amendments thereto;

(xii) the declaration and payment of any dividend or other distribution (other than such dividends or other distributions (i) required to be made pursuant to the terms of any outstanding preferred stock of the Company or (ii) in connection with the transactions described in the IPO Registration Statement);

(xiii) the entry into any merger, consolidation, recapitalization, liquidation, or sale of the Company or all or substantially all of the assets of the Company or consummation of a similar transaction involving the Company . . . ;

(xiv) voluntarily initiating any liquidation, dissolution or winding up of the Company or permitting the commencement of a proceeding for bankruptcy, insolvency, receivership or similar action with respect to the Company or any of its Subsidiaries or Controlled Affiliates;

(xv) the entry into or material amendment of any Material Contract;

(xvi) the entry into any transaction, or series of similar transactions or Contract . . . that would be required to be disclosed under Item 404 of Regulation S-K under the Exchange Act;

(xvii) the initiation or settlement of any material Action; or

(xviii) changes to the Company's taxable year or fiscal year.

*Moelis Supreme* held that these provisions had hypothetical legal significance and were not incurably void because (i) each could have appeared in the charter under Section 102(b)(1), (ii) including them in the charter would not violate any other provisions of the DGCL, and (iii) including them in the charter would not violate any strong Delaware public policy. Those conclusions have significant implications for the Pubco Pre-Approval Requirements.

### a.    No Aggregate Analysis

The first implication of *Moelis Supreme* is that hypothetical legal significance does not require analyzing the pre-approval requirements in the aggregate. *Moelis Merits* evaluated the Moelis Pre-Approval Requirements in the aggregate and held that they collectively violated Section 141(a).[82] Given that ruling, the trial court did not evaluate the Moelis Pre-Approval Requirements individually.[83]

Nothing in *Moelis Supreme* suggests a similar analysis of the provisions in the aggregate. To the contrary, *Moelis Supreme* appears to have analyzed the provisions individually by agreeing with Moelis that "*each* of the challenged provisions 'could

---

[82] *Moelis Merits*, 311 A.3d at 820.

[83] *Id.*

have been lawfully implemented through the certificate of incorporation under § 102(b)(1) and § 141(a) of the DGCL."[84] The logical implication is that there is no obligation to consider the aggregate effects of a suite of charter-based pre-approval requirements when evaluating whether they pass muster under Section 102(b)(1), whether in terms of a conflict with other sections of the DGCL or as a matter of Delaware public policy. When analyzing the Pubco Pre-Approval Requirements, therefore, this decision need not consider them in the aggregate.

### b.  No Granularity Problem

The next implication of *Moelis Supreme* is that granularity of control does not impede charter-based validity under Section 102(b)(1). The plaintiff argued that charter-based requirements could only apply to major corporate actions and could not "invade a board's deliberative process."[85]

*Moelis Supreme* does not suggest that including the Moelis Pre-Approval Requirements in the charter would create any issue of public policy because of the granular control they provided. The logical implication is that granularity of control over the board or the corporation is not a concern when evaluating whether a suite of charter-based pre-approval requirements pass muster under Section 102(b)(1), whether in terms of a conflict with other sections of the DGCL or as a matter of

---

[84] *Moelis Supreme*, 2026 WL 184868, at *10 (emphasis added) (quoting *Moelis Supreme*, Case No. 340, 2024, Dkt. 38 at 1).

[85] *Moelis Supreme*, Case No. 340, 2024, Dkt. 41 at 2.

Delaware public policy. When analyzing the Pubco Pre-Approval Requirements, therefore, this decision need not consider their granularity.

### c. No Core-Duty Problem

A third implication of *Moelis Supreme* is the implicit rejection of the concept of a core area of board power that even the charter cannot regulate—or at least cannot regulate without making the party holding the charter-based right take on the fiduciary duties that the directors otherwise would owe. *Moelis Merits* acknowledged that much of what the Moelis Agreement contained likely could have been implemented through the charter, but the decision cautioned that some provisions might be void because "[t]his court has indicated that some restrictions on board action could be invalid even if they appear in the charter."[86] But *Moelis Merits* did not confront those issues, because the decision held that the Moelis Pre-Approval Requirements violated Section 141(a) collectively.[87]

---

[86] *Moelis Merits*, 311 A.3d at 822 n.19. In *Jones Apparel*, this court suggested, albeit without ruling on the issue, that charter-based limitations on the board's ability to act as the gatekeeper for charter amendments and mergers could be suspect. *See Jones Apparel*, 883 A.2d at 852.

[87] *Moelis Merits*, 311 A.3d at 820 ("The plaintiff challenges the Pre-Approval Requirements individually and collectively. This decision only reaches the collective challenge. Taken together, the Pre-Approval Requirements force the Board to obtain Moelis' prior written consent before taking virtually any meaningful action. With the Pre-Approval Requirements in place, the Board is not really a board. The directors only manage the Company to the extent Moelis gives them permission to do so. This decision need not consider whether some lesser combination of rights might pass muster under Section 141(a). The Pre-Approval Requirements go too far.").

39

On appeal, the plaintiff pressed this argument. Relying on *Jones Apparel*, the plaintiff contended that Chief Justice Strine, then a Vice Chancellor, only declined to invalidate a charter provision that arguably conflicted with the board's statutory authority to set a record date for a meeting because "no public policy set forth in the DGCL (or in our common law of corporations) [was] contravened by the [] charter provision at issue."[88] The future Chief Justice cautioned that "more serious intrusions on core director duties" could be invalid, citing a board's statutory powers to approve mergers and charter amendments as involving "core director duties."[89] The plaintiff in *Moelis Supreme* further argued on appeal that if a charter provision could invade a board's core authority, then the provision had to transfer the board's fiduciary duties over that area to the holder of the charter-based right.[90]

---

[88] *Jones Apparel*, 883 A.2d at 838.

[89] *Id.* at 851–52. In support of this argument on appeal, the plaintiff cited a legal opinion that Richards, Layton & Finger, P.A. issued to The Boeing Company in 2009. That opinion concluded that a stockholder resolution that would have limited a board's ability to call a special meeting of stockholders to situations in which the directors had support from 10% of the stockholders was so contrary to Delaware law that it could not have been implemented through a charter amendment. *See Moelis Supreme*, Case No. 340, 2024, Dkt. 43 at 9. Citing *Jones Apparel*, the firm opined that "[b]ecause the Proposal seeks to modify or eliminate a 'core' power of the Board, the proposal may not be implemented through the Certificate of Incorporation," much less through a stockholder proposal. *Id.*

[90] The plaintiff cited a 1970 article by Professor Folk discussing the Board Power Exception, which stated that if the charter delegated board authority to another party, then "it would seemingly follow as a necessary corollary that those who possess such directorial authority would incur those management liabilities normally resting upon members of the board." Ernest L. Folk, III, *Corporation Law Developments—1969*, 56 Va. L. Rev. 755, 779–80 (1970). The plaintiff also cited more

*Moelis Supreme* did not embrace either argument. That suggests the absence of core areas of board authority that could limit the effectiveness of a charter-based pre-approval requirement under Section 102(b)(1). When analyzing the Pubco Pre-Approval Requirements, therefore, this decision need not consider their potential encroachment on areas of core board authority.

### d. No Statutory Sequencing Problem

A final implication of *Moelis Supreme* is to eliminate concern over a distinction between pre-approval requirements that must be met before a board can consider acting and after-the-fact veto rights, such as voting rights or consent rights, that come into play after the board has acted. The distinction could have mattered, particularly for corporate acts where the DGCL calls for a specific sequence of events that begins with the board, such as charter amendments.[91] *Moelis Merits* cautioned that

---

recent work by two Delaware practitioners, who wrote: "[I]t appears that while the charter can limit board power, it can do so only by taking managerial power from the directors and delegating it to substitute fiduciaries who accept the fiduciary responsibilities that accompany that power." Frederick H. Alexander & James D. Honaker, *Power to the Franchise or the Fiduciaries?: An Analysis of the Limits on Stockholder Activist Bylaws*, 33 Del. J. Corp. L. 749, 758 n.30 (2008).

[91] Section 242 of the DGCL governs charter amendments after a corporation has issued stock. Under Section 242, effectuating a charter amendment requires two steps that must occur in order. First, the board of directors must adopt a resolution declaring the advisability of the amendment and calling for a stockholder vote. Second, a majority of the outstanding stock entitled to vote must vote in favor. 8 *Del. C.* § 242(b)(1). Those "two discrete corporate events must occur, in precise sequence" for the amendment to be effective. *Williams v. Geier*, 671 A.2d 1368, 1381 (Del. 1996). Under this statutory sequence, "[t]he stockholders may not act without prior board action." *Id.*

41

Delaware law was "unclear" regarding "whether a charter provision could require a stockholder's pre-approval, before the board could act."[92]

*Moelis Supreme* upheld each of the Moelis Pre-Approval Requirements, including those creating sequencing issues. When analyzing the Pubco Pre-Approval Requirements, therefore, this decision need not consider whether they depart in some cases from a statutorily prescribed sequence that contemplates the board as the transactional gatekeeper.

### 4. Hypothetical Legal Significance And The Board Covenants

In addition to the Moelis Pre-Approval Requirements, the Moelis Agreement contained provisions that imposed affirmative covenants on the board. Two are pertinent for this case:

- A requirement that the board recommend that the stockholders vote for any Moelis nominee (the "Moelis Recommendation Provision"), and

- A requirement that the board fill any vacancy created by the departure of a Moelis nominee with another Moelis nominee (the "Moelis Vacancy Provision").

---

[92] *Moelis Merits*, 311 A.3d at 822 n.19. *Wagner Chancery* held that pre-approval requirements in a governance agreement for charter amendments and mergers were void *both* for violating Section 141(a) and due to conflicts with the statutorily required sequence for those transactions. *See Wagner Chancery*, 316 A.3d at 874–78; *accord Bank of Am. Corp.*, 2009 WL 851492, at *69 (S.E.C. No-Action Letter Feb. 26, 2009) ("It is undisputed that the decision whether to deem an amendment to the certificate of incorporation advisable is vested in the discretion of the board of directors, subject to the directors' fiduciary duties. Because the Proposal would impermissibly limit the directors' exercise of their fiduciary duties in determining whether to deem such amendment advisable, implementation of the Proposal would be invalid under the General Corporation Law.").

*Moelis Supreme* held that those provisions could appear in the charter.[93] That holding

has significant implications for the Pubco Board-Majority Right and the Pubco Chair-

Designation Right.

*Moelis Merits* held that the Moelis Recommendation Provision was facially

invalid, not only because it violated Section 141(a), but also because it would prevent

a board from fulfilling its fiduciary duty to make an accurate recommendation along

with truthful disclosures to stockholders.[94] *Seavitt* held that a provision in a

---

[93] The Moelis Agreement contained one other covenant that remained at issue on appeal. It required the board maintain its size at not more than eleven seats. Under the doctrine of hypothetical legal significance, that requirement easily qualified as non-void. The DGCL permits the bylaws to specify the board's size. 8 *Del. C.* § 141(b). Any provision that can legitimately appear in the bylaws can appear in the charter. *Id.* § 102(b)(1) ("Any provision which is required or permitted by any section of this chapter to be stated in the bylaws may instead be stated in the certificate of incorporation[.]"). In a decision issued before the advent of hypothetical legal significance, the Court of Chancery held that an agreement implementing a cap on board size was void. *See Chapin v. Benwood Found., Inc.*, 402 A.2d 1205, 1210–11 (Del. Ch. 1979) (holding directors could not bind themselves by agreement to maintain a board size of four members when the governing documents permitted a range of three to five), *aff'd sub nom. Harrison v. Chapin*, 415 A.2d 1068 (Del. 1980). The Pubco Agreement does not contain a board-size provision.

[94] *Moelis Merits*, 311 A.3d at 827, 870–72. *Moelis Merits* relied on two strands of law. The first strand involves the duty of disclosure and the inability of directors to constrain their disclosure obligations. *E.g., Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("[W]hen directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty."); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *5 (Del. Ch. Apr. 28, 2004) ("Arbinet's directors were not free to contract away disclosure obligations that they had a fiduciary duty to observe."). The second strand involves recommendation requirements, where Delaware law is well developed due to disputes over provisions that have attempted to prevent a board from changing its recommendation in favor of a merger. *See generally In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 494–96 (Del. Ch. 2013). The board's recommendation is material

43

governance agreement comparable to the Moelis Vacancy Provision was facially invalid, not only because it violated Section 141(a), but also because it would prevent a board from fulfilling its fiduciary duties when filling vacancies.[95]

*Moelis Supreme* held that these provisions could have been lawfully implemented through charter provisions under Section 102(b)(1), notwithstanding

---

information that must be disclosed to the stockholder. *Smith v. Van Gorkom*, 488 A.2d 858, 888 (Del. Ch. 1985) (subsequent history omitted) (explaining that a board cannot "delegate to the stockholders the unadvised decision as to whether to accept or reject the merger"); Steven M. Haas, *Limiting Change of Merger Recommendations to "Intervening Events"*, 13 No. 8 M&A Law 15, 15 (Sept. 2009) ("The board's merger recommendation is also part of its broader fiduciary duties to stockholders . . . . [which] include a duty of disclosure."); William T. Allen, *Understanding Fiduciary Outs: The What and the Why of an Anomalous Concept*, 55 Bus. Law. 653, 658 (2000) (noting that the disclosure of a current merger recommendation is encompassed within "the board's fiduciary obligation of candor"). "A board may not suggest or imply that it is recommending the merger to the shareholders if in fact its members have concluded privately that the deal is not now in the best interest of the shareholders." Allen, *supra*, at 658; *accord* R. Franklin Balotti & A. Gilchrist Sparks, III, *Deal-Protection Measures and the Merger Recommendation*, 96 Nw. U. L. Rev. 467, 476 (2002) ("Delaware law requires that a board of directors give a meaningful, current recommendation to stockholders regarding the advisability of a merger including, if necessary, recommending against the merger as a result of subsequent events," and a provision that "forbids the board from changing its recommendation, even if the merger is no longer advisable," "prevent[s] the directors from fulfilling this obligation."); John F. Johnston, *A Rubeophobic Delaware Counsel Marks Up Fiduciary-Out Forms: Part II*, Insights: The Corp. & Sec. L. Advisor, Feb. 2000, at 16, 19 (explaining that a target board may not "tie its hands . . . [and] agree to recommend the existing agreement even when, because of changed circumstances, it believes the existing agreement is not, at the time of its recommendation, in the stockholders' best interests"); *see Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at *28 (Del. Ch. Apr. 29, 2005) ("Revisiting the commitment to recommend the Merger was not merely something that the Merger Agreement allowed the [Target] Board to do; it was the duty of the [Target] Board to review the transaction to confirm that a favorable recommendation would continue to be consistent with its fiduciary duties.").

[95] *Seavitt*, 321 A.3d at 550–51.

44

any fiduciary duty issues. The only way to square this circle is if a charter provision can tailor a board's fiduciary obligations. As a statutory matter, fiduciary tailoring follows from the premise that "[t]he existence and exercise of [the board's authority under Section 141(a)] carries with it certain fundamental fiduciary obligations to the corporation and its shareholders."[96] Because the board's authority under Section 141(a) provides the foundation for the directors' fiduciary duties, modifying the board's authority under Section 141(a) modifies the directors' fiduciary duties.

*Moelis Supreme* implicitly adopts this approach by holding that the Moelis Recommendation Provision and Moelis Vacancy Provision could be implemented using Section 102(b)(1). Once implemented, the obligation modifies the board's fiduciary duties, including the scope of the duty of disclosure. The logical implication is that charter-based provisions adopted under Section 102(b)(1) can tailor a board's duties through the Board Power Exception without violating Delaware public policy. When analyzing the Pubco Board-Majority Right and the Pubco Chair-Designation Right, therefore, this decision need not consider the constraints they impose on the board's ability to exercise its fiduciary duties.

### 5. Hypothetical Legal Significance And The Dead-Hand Problem

A final lesson from *Moelis Supreme* concerns the degree to which the hypothetically significant alternative must achieve exactly the same result as the provision the corporation attempted to implement. On appeal in *Moelis,* the plaintiff

---

[96] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (subsequent history omitted).

argued that the corporation could not replicate the provisions in the Moelis Agreement through its charter, because the Moelis Agreement could not be amended without Partners' consent.[97] The plaintiff labeled this the "Dead-Hand Problem." That outcome derives from contract law: Unless a contract provides otherwise, all parties must consent to any amendment.

A corporate charter is different. The DGCL ensures that a charter can always be amended.[98] The DGCL also permits a charter to be modified by merger.[99] And the state retains the power to modify the DGCL, which every charter incorporates.[100] Charters cannot be made unamendable.[101] There is no Dead-Hand Problem.

---

[97] *See Moelis Supreme*, Case No. 340, 2024, Dkt. 41 at 1, 3–4.

[98] 8 *Del. C.* § 242.

[99] *Id.* § 251.

[100] *Levin v. Metro-Goldwyn-Mayer, Inc.*, 221 A.2d 499, 501 (Del. Ch. 1966) ("The reserved power to amend a corporate charter is, of course, firmly established[.]"); *see* 8 *Del. C.* § 121(b) ("Every corporation shall be governed by the provisions and be subject to the restrictions and liabilities contained in this chapter."); *id.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation except so far as the same are inapplicable and inappropriate to the objects of the corporation."); *STAAR Surgical*, 588 A.2d at 1136 ("[I]t is a basic concept that the General Corporation Law is a part of the certificate of incorporation of every Delaware company."); *see also Havender*, 11 A.2d at 333 ("It is elementary that [the DGCL's merger and consolidation] provisions are written into every corporate charter.").

[101] *See Fortinet, Inc.*, 2026 WL 1217034, at *6, *8 (S.E.C. No-Action Letter Mar. 3, 2026) (opining that "an 'irrepealable' provision would be invalid" under the DGCL because the charter and bylaws are always amendable); *accord Gen. Dynamics Corp.*, 2026 WL 1244814, at *6, *8 (S.E.C. No-Action Letter Feb. 11, 2026); *McDonald's*

*Moelis Supreme* did not address the Dead-Hand Problem explicitly, instead holding generally that nothing in the DGCL or Delaware law generally "would stand in the way" of charter-based versions of the challenged provisions.[102] Although the plaintiff was technically correct about the Dead-Hand Problem, preferred stock often carries special voting rights requiring holder consent for charter amendments or mergers.[103] The charter can also require a supermajority vote—even unanimity—for charter amendments or mergers.[104] A corporation can thus craft a governance structure that effectively makes its charter unamendable without a particular stockholder's consent, creating a facsimile of the Dead-Hand Problem.

*Moelis Supreme*'s treatment of the Dead-Hand Problem is important for understanding the scope of hypothetical legal significance. Because of the Dead-Hand Problem, Moelis could not literally replicate the Moelis Agreement, but it could come close. That suggests that hypothetical legal significance turns on whether a

---

*Corp.*, 2026 WL 1274960, at *6, *8 (S.E.C. No-Action Letter Jan. 30, 2026); *Labcorp Hldgs. Inc.*, 2026 WL 1244818, at *8, *10 (S.E.C. No-Action Letter Jan. 16, 2026).

[102] *Moelis Supreme,* 2026 WL 184868, at *10.

[103] *See Fortinet,* 2026 WL 1217034, at *9 ("A corporation may limit its ability to amend its certificate of incorporation or bylaws through provisions that require supermajority or separate class votes in order for stockholders to approve amendments.").

[104] *See* 8 *Del. C.* § 102(b)(4) (authorizing "Provisions requiring for any corporate action, the vote of a larger portion of the stock or of any class or series thereof, or of any other securities having voting power, or a larger number of the directors, than is required by this chapter").

functionally equivalent outcome is achievable. For purposes of analyzing the Pubco Pre-Approval Requirements, the Pubco Board-Majority Right, and the Pubco Chair-Designation Right, this decision need not consider the Dead-Hand Problem.

### 6. Hypothetical Legal Significance And Delaware Law

In addition to the specific implications for the challenged provisions in the Moelis Agreement, *Moelis Supreme* has broader consequences for Delaware law. The *Moelis* case resulted in lessons learned that carry over to this case, where the same counsel challenged similar provisions in the Pubco Agreement. Had *Moelis Supreme* not gone first, those lessons could have been learned through this action.

### a. A Broader Fix For The *Triplex* Problem

For starters, the doctrine of hypothetical legal significance implicitly completes the abrogation of *Triplex*,[105] *Waggoner*,[106] *STAAR Surgical*,[107] and their progeny.[108] *Triplex, Waggoner*, and *STAAR Surgical* created the problem of incurable voidness

---

[105] *Triplex Shoe Co. v. Rice & Hutchins*, 152 A. 342 (Del. 1930).

[106] *Waggoner v. Laster*, 581 A.2d 1127 (Del. 1990).

[107] 588 A.2d 1130.

[108] *E.g., Boris*, 2013 WL 6331287, at *8, *15 (holding that shares were incurably void where stock ledger had no entries, no certificates had been issued, and the board never approved a stock issuance in a written instrument, so the shares were never issued); *Blades v. Wisehart*, 2010 WL 4638603, at *3, *12 (Del. Ch. Nov. 17, 2010) (holding that corporation failed to implement a 1-for-5 forward stock split, rendering the resulting shares incurably void); *Liebermann v. Frangiosa*, 844 A.2d 992, 1006, 1009 (Del. Ch. 2002) (holding that preferred stock was void where corporation never obtained the necessary votes for the charter amendment authorizing the shares and never filed a certificate of amendment or certificate of designations).

48

based on statutory non-compliance. As a partial fix, the Corporation Law Council of the Delaware State Bar Association shepherded the Validation Amendments through the General Assembly.[109] The concept of hypothetical legal significance sweeps more broadly, further reducing the threat of incurable voidness.

### i. *Triplex*

*Moelis Supreme* is easily the most significant voidness decision since *Triplex*, the century-old case in which the Delaware Supreme Court held that failing to comply with the statutory requirements for a course of action—there, the issuance of no-par stock—rendered the action incurably void. Under the doctrine of hypothetical legal significance, the corporation could have validly accomplished the stock issuance through a hypothetical provision in its charter, so *Triplex* would come out differently.

*Triplex* involved a stock issuance that the corporation had the power to implement under the DGCL, if only the corporation had followed the statutorily required steps. In 1919, the original certificate of incorporation for the Triplex Shoe Company purported to authorize preferred stock and stated that "the remaining $75,000 (of capital) in shares of common stock without par value."[110] But the original charter did not state the number of no-par shares authorized as then required by law.[111] At the initial board meeting and thereafter, the board issued shares of common

---

[109] *See* Del. S.B. 75, 148d Gen. Assem. §§ 8–9 (2015).

[110] *Triplex*, 152 A. at 345.

[111] *Id.* at 343–45.

stock, and in 1921, the corporation later amended its charter to specify the number of shares of common stock outstanding.[112] In 1921 and 1922, a firm called Rice & Hutchins received a combination of common and preferred stock in exchange for goods. Rice & Hutchins voted its common stock in every election until 1929, and one of its representatives served as a director from 1925 until 1928.[113] At the 1929 annual meeting, Rice & Hutchins ran a slate of directors. If the common stock was validly issued, then its slate lost. If not, then its slate won.

The Delaware Supreme Court held that the original grant of authority for the no-par common stock was "unauthorized by law," "inoperative," and "meaningless in view of the law."[114] Triplex argued that "even though it was issued illegally," the common stock "was not void, but voidable."[115] After surveying the case law, the Delaware Supreme Court held that the common stock was void, reasoning that because the company failed to comply with the statutory steps for authorizing no-par common stock, "the corporation had no power or authority from the State to issue the stock in question."[116] The court concluded that "[s]uch stock, when attempted to be

---

[112] *Id.* at 344.

[113] *Id.* at 345.

[114] *Id.*

[115] *Id.* at 346.

[116] *Id.* at 347.

issued, must be treated as a nullity."[117] The court also held that the attempt to amend the original certificate to validate the stock was ineffective, stating:

> We are unable to see how the amendment could have made stock valid that was void because issued without any authority from the State. Such an amendment might cure certain irregularities, imperfections and defects in a stock issue that is authorized by the charter and laws of the State, but it does not seem to us that it can possibly relate back and validate a stock that was issued without any corporate authority.[118]

Because the stock was void, equitable defenses could not validate it.

*Triplex* would come out differently after *Moelis Supreme.* A Delaware corporation in 1919 had the *power* to issue no-par stock. The problem was that the DGCL requires that the corporation implement that power through its charter, just like the Board Power Exception requires that modifications to board authority appear in the charter. Just as Moelis hypothetically could have included the Moelis Pre-Approval Requirements, Moelis Recommendation Provision, and Moelis Vacancy Provision in its charter, Triplex hypothetically could have specified the number of no-par shares in its charter. Not only that, but just as Moelis hypothetically could have granted the rights in question by amending its charter, Triplex *actually attempted that fix* by amending its charter to authorize the no-par common stock.

*Triplex* established the proposition that a corporate act is void if the DGCL prescribes a particular method for accomplishing it (e.g., specifying the number of

---

[117] *Id.*

[118] *Id.* at 347–48.

shares of no-par stock in the charter) but the corporation fails to follow the statutory requirements. *Moelis Supreme* holds that if the corporation could have accomplished a result through its charter, the act is voidable, not void. Under the doctrine of hypothetical legal significance, it is difficult to see how *Triplex* remains good law.

### ii.      *Waggoner* And *STAAR Surgical*

If *Triplex* was the grandaddy of Delaware voidness cases, then *Waggoner* and *STAAR Surgical* were the most consequential. Under the doctrine of hypothetical legal significance, they would come out differently.[119]

*Waggoner* addressed the validity of super-voting convertible preferred stock that STAAR Surgical issued to its CEO in return for him guaranteeing the corporation's debt. Two years later, the CEO voted the preferred stock to reconstitute the board. STAAR Surgical's charter included blank check authority, but "[n]otably absent from the various powers, preferences and rights" that the board could confer "was any reference to voting rights or supermajority voting rights" for preferred stock.[120] An ousted director argued that the preferred stock lacked voting rights.

The Delaware Supreme Court held that without the authority to confer super-voting rights on preferred stock, the voting rights that the CEO purported to exercise

---

[119] *Moelis Justiciability* cited *Waggoner* and *STAAR Surgical* for the proposition that equitable defenses cannot validate void acts. *See Moelis Justiciability*, 310 A.3d at 994 n.12.

[120] *Waggoner*, 581 A.2d at 1130–31.

were "null and void."[121] The CEO responded that the directors he removed should be estopped from objecting to the preferred stock's voting rights because they induced him to guarantee STAAR Surgical's debt in reliance on the promise of voting control. Relying on *Triplex*, the Delaware Supreme Court held that "there can be no estoppel to challenge the void act of creating super-majority voting rights."[122] The CEO then argued that *Triplex* established a limited rule for illegal stock issuances that "should not be extended to . . . other corporate actions such as the granting of super-majority voting rights."[123] The justices, however, saw "no logical basis for adopting such a limitation."[124]

*Waggoner* would come out differently under the doctrine of hypothetical legal significance. When STAAR Surgical's board issued the preferred stock to the CEO, the DGCL authorized super-voting preferred stock. A corporation could authorize super-voting preferred stock directly in its charter, or it could have a blank check provision that included authority to confer voting rights. Just as Moelis could have amended its charter to include the Moelis Pre-Approval Requirements, the Moelis

---

[121] *Id.* at 1133.

[122] *Id.* at 1136; *accord id.* at 1137–38 ("[T]he power to establish special voting rights is conspicuously absent from the list of preferences the Board was authorized to confer. No other provision of STAAR's certificate clearly grants the Board such authority . . . . Under these circumstances, there is no estoppel to challenge the validity of a void act.").

[123] *Id.* at 1137.

[124] *Id.*

Recommendation Provision, or the Moelis Vacancy Provision, STAAR Surgical could have amended its charter to authorize preferred stock with super-majority voting rights. Or STAAR Surgical could have added the authority to confer voting rights to its blank check provision.

*STAAR Surgical* built on *Waggoner*. The CEO's preferred stock was convertible into common stock, and the CEO purported to exercise that right. He then sued to establish his right to vote the resulting shares, arguing that even if the super-voting preferred stock could not vote, the post-conversion common stock could.[125] The Court of Chancery found that the board had not formally approved either resolution establishing the preferred stock or the certificate of designations.[126] But the court also held that even if the preferred stock's super-voting rights were invalid, the CEO was equitably entitled to ownership of the common stock and associated voting control.[127]

The Delaware Supreme Court reversed. The justices first held that the failure to comply with the statutory steps for creating the preferred stock rendered those shares void.[128] The justices next held that because the original preferred stock was

---

[125] *STAAR Surgical*, 588 A.2d at 1134.

[126] *Id.*

[127] *Id.*

[128] *Id.* at 1136 ("Based on the trial court's findings, it is clear that the preferred convertible shares originally issued to the Waggoners were invalid and void under Delaware law. There was no compliance with the terms of 8 *Del. C.* § 151. The directors never formally adopted either the December 17, 1987 resolution or the certificate of designation.").

void, the resulting common stock was void.[129] The justices finally concluded that because the shares were void, the Court of Chancery "should not have invoked equitable remedies to resuscitate plainly void stock."[130] The CEO argued that because the company had authority to issue convertible preferred stock and common stock, the shares were voidable rather than void. The Delaware Supreme Court rejected that argument, holding the preferred stock was in fact void, so "the Court of Chancery had no basis to grant equitable relief."[131]

*STAAR Surgical* would come out differently under the doctrine of hypothetical legal significance. When the STAAR Surgical board attempted to issue convertible preferred stock to the CEO, the DGCL authorized convertible preferred stock, and STAAR Surgical's charter authorized convertible preferred stock. The preferred stock was void only because the board failed to follow the specific statutory steps that the DGCL required for issuing blank check preferred stock. Under the reasoning in *Moelis Supreme*, the corporation could have issued the preferred stock in compliance with its charter simply by taking the right statutory steps. The corporation did not

---

[129] *Id.* ("It is undisputed that Waggoner could not receive his common stock without exercising the conversion option of at least one preferred share. The December 17, 1987 resolution and the certificate of designation purportedly authorized the issuance of the preferred shares. Without validly issued preferred stock, there was simply no other legal mechanism by which the common shares could be issued. Simply stated, if the preferred shares were void, as the Court of Chancery assumed, then the common stock could not be created out of whole cloth.").

[130] *Id.* at 1131.

[131] *Id.* at 1137.

even have to follow a hypothetical alternative path, the corporation simply could have properly followed the path it chose.

*Waggoner* and *STAAR Surgical* followed *Triplex* in holding that a corporation's failure to comply with the statutory requirements for a course of action results in the action being incurably void. *Moelis Supreme* holds that if the corporation could have validly accomplished the stock issuance through a hypothetical provision in its charter, then the act is provisionally effective yet voidable, defensible, or fixable. After *Moelis Supreme*, it is hard to see how *Waggoner* and *STAAR Surgical* remain good law.

### iii.    Improving On The Validation Amendments

After *Waggoner* and *STAAR Surgical*, a series of Court of Chancery decisions held transactions incurably void for lack of statutory compliance.[132] Because Delaware law did not yet recognize hypothetical legal significance, the Corporation Law Council responded with the Validation Amendments.[133] Those amendments, however, came with two limitations. First, the corporation had to invoke them affirmatively by engaging in self-help validation or seeking judicial validation.

---

[132] *E.g.*, *Boris*, 2013 WL 6331287, at *15; *Blades*, 2010 WL 4638603, at *3, *12; *Liebermann*, 844 A.2d at 1006, 1009. In each case, the DGCL authorized the corporation to accomplish the result it sought to achieve. The corporation simply failed to comply with the statutory requirements. Applying *STAAR Surgical,* each decision held the outcome void, foreclosing equitable defenses. Under the doctrine of hypothetical legal significance, each decision would come out differently.

[133] *See* 8 *Del. C.* §§ 204–205.

Absent either, the voidness problem remained. Second, "[e]mbedded within the definition of defective corporate act is the premise that an act, albeit defective, had occurred."[134] A corporation that sought to invoke the Validation Amendments had to have attempted to act in a specific way, and the steps required for validation depended on the statutory path the corporation chose.[135]

The doctrine of hypothetical legal significance sweeps more broadly than the Validation Amendments because it does not require affirmative action by the corporation and is not limited to the path the corporation chose. Nominally, the doctrine achieves a narrower outcome than the Validation Amendments, because a finding of hypothetical legal significance results in the transaction being provisionally effective yet voidable, defensible, or fixable, while compliance with the Validation Amendments validates the defective act. But as cases like *Triplex*, *Waggoner*, *STAAR Surgical*, and *Moelis Supreme* illustrate, equitable defenses or other bases to uphold a transaction often exist. *Moelis Supreme* therefore may end up

---

[134] Bigler & Zeberkiewicz, *supra*, at 403.

[135] *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 437–38 (Del. Ch. 2020) (explaining that "[p]arties attempting to invoke the Validation Provisions cannot pretend that an attempt to act took place when it really did not" because the statute implicitly requires "an actual attempt to exercise corporate power"); *In re Numoda Corp. S'holders Litig.*, 2015 WL 402265, at *7–10 (Del. Ch. Jan. 30, 2015) (stating that "[t]he Court cannot determine the validity of a defective corporate act without an underlying corporate act" which "are driven by board meetings, at which directors make formal decisions"), *aff'd*, 128 A.3d 991 (Del. 2015) (TABLE).

offering an easier path to validation than the Validation Amendments, providing a significant benefit to Delaware corporations.

### b. Cleaning Up Outdated Rule Statements

Next, *Moelis Supreme* helpfully facilitates a doctrinal spring cleaning of older rule statements about voidness. Three stand out.

One line of cases referred to bad faith acts—framed as acts "not performed in the interest of the corporation"—as void.[136] An act that the corporation has the power to take but which a fiduciary takes in bad faith is not void; it remains within the power of the corporation. Under Section 144 (both before and after 2025)[137] and cases

---

[136] *E.g.*, *Solomon v. Armstrong*, 747 A.2d 1098, 1114 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) ("As defined by decisional law, void acts are those acts that are not performed in the interest of the corporation, irrespective of whether or not they are authorized by a corporation's certificate of incorporation."). It is not clear that this statement was ever true. Harold Marsh, Jr., the strongest proponent of a pre-1919 rule of invalidity for self-interested transactions, only argued that they were universally voidable, not void. Harold Marsh, Jr., *Are Directors Trustees? Conflict of Interest and Corporate Morality*, 22 Bus. Law. 35, 36 (1966). More recent scholarship questions the strength of Marsh's claim, opening further ground for believing that acts not performed in the best interests of the corporation were voidable, not void. *See generally* David Kershaw, *The Foundations Of Anglo-American Corporate Fiduciary Law* 322–68 (2018); Andrew F. Tuch, Jr., *Reassessing Self-Dealing: Between No Conflict and Fairness*, 88 Fordham L. Rev. 939 (2019); Norwood P. Beveridge, *Interested Director Contracts at Common Law: Validation Under The Doctrine Of Constructive Fraud*, 33 Loy. L.A. L. Rev. 97 (1999).

[137] *See 8 Del. C.* § 144(a) (2025); *id.* § 144(a) (2024).

58

like *Corwin*,[138] *MFW*,[139] and *Investors Bancorp*,[140] fully disclosed conduct that could be viewed as a loyalty breach can be cleansed (whether through ratification or an organic statutory vote).[141] Claims for breach of the duty of loyalty, including for actions in bad faith, are subject to affirmative defenses. After *Moelis Supreme*, it is hard to see how statements about bad faith acts being void remain good law.

Another line of cases refers to acts of fraud as being void.[142] In older corporate cases, references to "fraud" often meant constructive fraud, which courts used as a synonym for breach of fiduciary duty.[143] As discussed, breaches of fiduciary duty—

---

[138] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[139] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[140] *In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208 (Del. 2017).

[141] *See Solomon*, 747 A.2d at 1114–17 (describing then-applicable legal framework for ratification of breaches of the duty of loyalty).

[142] *E.g.*, *Gantler v. Stephens*, 965 A.2d 695, 713 n.54 (Del. 2009) (listing "fraud" as a void act); *Michelson v. Duncan*, 407 A.2d 211, 219 (Del. 1979) (listing "fraudulent" acts as void); *Nevins*, 885 A.2d at 245 (listing "fraud" as a void act); *In re Walt Disney Co.*, 2004 WL 2050138, at *7 (Del. Ch. Sept. 10, 2004) (same); *State of Wis. Inv. Bd. v. Peerless Sys. Corp.*, 2000 WL 1805376, at *14 (Del. Ch. Dec. 4, 2000) (same); *Solomon*, 747 A.2d at 1114 (same).

[143] *See Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1218 (Del. Ch. 2022) (explaining that in early cases, "fraud" was often used "as a synonym for breach of fiduciary duty"); *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1236–37 (Del. Ch. 2001) ("Our corporate case law has thrown [the so-called 'constructive fraud'] concept around in a not particularly precise way, but always in a context in which the court is examining whether directors have complied with their fiduciary duties."), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002). *See generally* 2 Dan B. Dobbs, *Handbook on the Law of Remedies* §10.4, at 661–70 (1993) (criticizing the use of the term "constructive fraud" and explaining its function as a tool for

even loyalty breaches—may render an act voidable, but they do not place the act beyond the power of the corporation. Common law fraud also does not render a contract void; it renders the contract voidable.[144] After *Moelis Supreme*, it is hard to see how statements about fraudulent acts being void remain good law.

A third line of cases refers to gifts and waste as being void.[145] Even under older cases, those acts could be ratified by unanimous stockholder vote. More importantly, as Chief Justice Strine explained while serving as Vice Chancellor, the actual application of voidness doctrine in those settings "has no apparent modern day utility insofar as the doctrine covers claims of waste or gift, except as an opportunity for Delaware courts to second-guess stockholders."[146] Contemporary Delaware decisions have brought waste within the fiduciary framework of the business judgment rule by

---

enforcing fiduciary relationships); 3 John Norton Pomeroy, A Treatise on Equity Jurisprudence §§ 922, 955–956, at 625–26, 788–92 (5th ed. 1941) (explaining concept of constructive fraud, including its application to situations involving fiduciary breach); 1 Joseph Story, Commentaries on Equity Jurisprudence as Administered in England and America § 307, at 309 (13th ed. 1886) (explaining that courts used the concept of "constructive fraud" to describe breaches of fiduciary duty).

[144] 1 Williston on Contracts § 1:20; *see Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011) ("As with all contracts, fraud in the inducement renders a life insurance policy voidable at the election of the innocent party.").

[145] *E.g.*, *Gantler*, 965 A.2d at 713 n.54 (listing "gift or waste" as void acts); *Michelson*, 407 A.2d at 219 (listing "gift or waste of assets" as a void act); *Disney*, 2004 WL 2050138, at *7 (listing "waste"); *Peerless*, 2000 WL 1805376, at *14 (listing "gifts or waste"); *Solomon*, 747 A.2d at 1114 (listing "gift" and "waste" as a void act).

[146] *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 897 (Del. Ch. 1999).

reconceiving waste as a means of pleading that the directors acted in bad faith.[147]

"The Delaware Supreme Court has implicitly held that committing waste is an act of bad faith."[148] Gifts were merely a form of waste. Today, fiduciary principles police that ground. Transactions that might be labeled gifts or waste are ratifiable and subject to equitable defenses. They are thus not void, but provisionally effective albeit voidable or defensible. After *Moelis Supreme*, it is hard to see how statements about gifts or waste being void remain good law.

### c.    Implications For The Section 141(a) Canon

The doctrine of hypothetical legal significance has more ambiguous implications for the Section 141(a) canon.[149] Even though *Moelis Supreme* declined to

---

[147] *See, e.g.*, *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001) ("To prevail on a waste claim or a bad faith claim, the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."); *CanCan Dev., LLC v. Manno*, 2015 WL 3400789, at *20 (Del. Ch. May 27, 2015) (explaining that waste is "best understood as one means of establishing a breach of the duty of loyalty's subsidiary element of good faith"); *Se. Pa. Transp. Auth. v. AbbVie Inc.*, 2015 WL 1753033, at *14 n.144 (Del. Ch. Apr. 15, 2015) ("This Court has found that, doctrinally, waste is a subset of good faith under the umbrella of the duty of loyalty . . . ."), *aff'd*, 132 A.3d 1 (Del. 2016) (TABLE), *overruled on other grounds by AmerisourceBergen Corp. v. Lebanon Cnty. Emps.' Ret. Fund*, 243 A.3d 417 (Del. 2020).

[148] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) (*citing White*, 783 A.2d at 553–55).

[149] *Moelis Merits* discussed the principal cases in the contemporary canon. In chronological order, they are *Field v. Carlisle Corp.*, 68 A.2d 817 (Del. Ch. 1949); *Abercrombie*, 123 A.2d 893; *Clarke Memorial College v. Monaghan Land Co.*, 257 A.2d 234 (Del. Ch. 1969); *Chapin*, 402 A.2d 1205; *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34 (Del. 1994); *Grimes I*, 1995 WL 54441; *Grimes II*, 673 A.2d

address whether any of the challenged provisions in the Moelis Agreement conflicted with Section 141(a), it is hard to see how those decisions remain good law—at least as written—under the doctrine of hypothetical legal significance.

At bottom, *Moelis Supreme* holds that non-charter-based limitations on board authority are not void but provisionally effective albeit voidable, defensible, or fixable. If that has always been true, then *Moelis Supreme* is not a big deal for the Section 141(a) cases.

Before *Moelis Supreme*, *Abercrombie* was the "cornerstone of the contemporary Section 141(a) canon."[150] *Abercrombie* can therefore elucidate whether non-charter-based limitations on board authority were always provisionally effective albeit voidable, defensible, or fixable.

*Abercrombie* does not contain the word "void." But that is not the only indicator of voidness. One clue comes from the precedents Chancellor Seitz cited. When articulating the rule that "our corporation law does not permit actions or agreements by stockholders which would take all power from the board to handle matters of

---

1207; *In re Bally's Grand Derivative Litig.*, 1997 WL 305803 (Del. Ch. June 4, 1997); *Carmody v. Toll Brothers, Inc.*, 723 A.2d 1180 (Del. Ch. 1998); *Quickturn II*, 721 A.2d 1281; *ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95 (Del. Ch. 1999); *Nagy v. Bistricer*, 770 A.2d 43 (Del. Ch. 2000); *Marmon*, 2004 WL 936512; *UniSuper Ltd. v. News Corp.*, 2005 WL 3529317 (Del. Ch. Dec. 20, 2005); *Sample v. Morgan*, 914 A.2d 647 (Del. Ch. 2007); *CA, Inc. v. AFSCME Employees Pension Plan*, 953 A.2d 227 (Del. 2008); *Schroeder v. Buhannic*, 2018 WL 11264517 (Del. Ch. Jan. 10, 2018); and *Politan Capital Management LP v. Masimo Corp.*, C.A. No. 2022-0948 (Del. Ch. Feb. 3, 2023) (TRANSCRIPT).

[150] *Moelis Merits*, 311 A.3d at 831.

substantial management policy," Chancellor Seitz referenced a line of cases from New York.[151] That line of authority includes the following decisions:

- *Manson*, where the Court of Appeals of New York held that a contract infringed on New York's statutory analog to Section 141(a). New York's highest court stated: "Clearly the law does not permit the stockholders to create a sterilized board of directors. Corporations are the creatures of the state, and must comply with the exactions and regulations it imposes. We conclude that the agreement here is illegal and void, and its violation is not a basis for a cause of action."[152]

- *McQuade*, where the Court of Appeals of New York again held that a contract infringed on New York's statutory analog to Section 141(a). The plaintiff asked the court to heed the "manners of the market place," sustain the agreement, and award damages, but New York's highest court held that "a contract is illegal and void so far as it precludes the board of directors, at the risk of incurring legal liability, from changing officers, salaries, or policies or retaining individuals in office, except by consent of the contracting parties."[153]

- *Clark*, where the Court of Appeals of New York noted that if an agreement violated New York's statutory analog to Section 141(a), then "the contract is illegal as against public policy within the decision in *McQuade*."[154]

- *Long Park*, where the Court of Appeals of New York held that a contract infringed on both the New York and New Jersey statutory analogs to Section 141. New York's highest court held that the agreement was "illegal, void, and unenforcible [sic]."[155]

---

[151] *Abercrombie*, 123 A.2d at 898 (citing *Long Park v. Trenton-New Brunswick Theatres Co.*, 77 N.E.2d 633 (N.Y. 1948), *Clark v. Dodge*, 199 N.E. 641 (N.Y. 1936), *McQuade v. Stoneham*, 189 N.E. 234 (N.Y. 1934), and *Manson v. Curtis*, 119 N.E. 559 (N.Y. 1918)).

[152] *Manson*, 119 N.E at 562.

[153] *McQuade*, 189 N.E. at 236–37.

[154] *Clark*, 199 N.E. at 641–42. On the facts presented, the *Clark* court held that the contract did not impinge on the board's authority. *Id.* at 642–43.

[155] *Long Park*, 77 N.E.2d at 635.

Chancellor Seitz also cited *Transamerica*, where the court held that a stockholder resolution requiring the directors to distribute a report of what took place at the annual meeting facially conflicted with Section 141(a) and "even if carried by a majority vote of the stockholders, would not be binding upon the officers and directors."[156] *Transamerica* relied on the same line of New York decisions, including *McQuade*.[157]

Those were not isolated authorities. *Moelis Merits* cited other pre-*Abercrombie* decisions holding that agreements were incurably void when they limited board authority in contravention of provisions comparable to Section 141(a).[158]

- In *West*, the Supreme Court of the United States held that such a contract was "void as against public policy."[159]

- In *Dubbs*, the Supreme Court of Pennsylvania held that such a contract could not be enforced as it was "against public policy."[160]

---

[156] *S.E.C. v. Transamerica Corp.*, 67 F. Supp. 326, 330 (D. Del. 1946), *modified on other grounds*, 163 F.2d 511 (3d Cir. 1947), *cert. denied*, 332 U.S. 847 (1948).

[157] *Id.* at 330 n.5.

[158] *Moelis Merits*, 311 A.3d at 829 nn.37 & 42 (collecting cases); *see generally* 2 Fletcher Cyc. Corp. § 281 (Validity of agreements creating obligations of directors or officers conflicting with public policy or official duty) (collecting cases holding agreements void); 12 A.L.R. 1070 (1921 & Supp.) (Validity of individual contract by director to put or maintain a designated person in office) (collecting cases holding agreements void).

[159] *West v. Camden*, 135 U.S. 507, 520 (1890).

[160] *Dubbs v. Kramer*, 153 A. 733, 734 (Pa. 1931) (citing *Singers-Bigger v. Young*, 166 F. 82, 85 (8th Cir. 1908) (referring to such a contract as "contrary to public policy and void"), and *Thomas v. Matthews*, 113 N.E. 669, 675 (Ohio 1916) (referring to such a contract as "against public policy and void")).

- In *Van Slyke*, the Supreme Court of Minnesota referred to such a contract as "void as against public policy" such that "no right of action can be founded thereon."[161]

Still more cases could be cited.[162] When *Abercrombie* issued, non-charter-based limitations on board authority were incurably void.

Another clue that Chancellor Seitz viewed the agents' agreement in *Abercrombie* as incurably void is the language he used. His statements included the following:

---

[161] *Van Slyke v. Andrews*, 178 N.W. 959, 960 (Minn. 1920) (reiterating that such a contract "is illegal and void").

[162] *E.g.*, *Jackson v. Hooper*, 75 A. 568, 573 (N.J. 1910) ("The directors . . . cannot enter into agreements, either among themselves or with stockholders, by which they abdicate their independent judgment. . . . The very contract upon which the complainant relies, so far as it provides for the creation, election, and maintenance of dummy directors, is contrary to every principle of the laws of this state."); *McCarter v. Fireman's Ins. Co.*, 73 A. 80, 85 (N.J. 1909) ("A contract by which the directors of such corporations in conclusive form abdicate their duty of management in this respect, and turn it over to an alien body, is in direct violation of the words and meaning of the statute, and is as typical an instance of an ultra vires act as can well be imagined. To do so in a given instance would be an illegal act."). *Jackson* is a particularly persuasive case because James Dill authored it. Dill had been the principal drafter of the New Jersey General Corporation Law and later became a judge on the New Jersey Court of Appeals and Errors. The Delaware analogy would be if Professor Folk had become a Delaware Supreme Court justice after leading the 1967 revision effort and authored a decision stating that non-charter-based limitations on director-authority were incurably void. Both New Jersey decisions carry precedential weight because the original drafters of the DGCL effectively copied the New Jersey statute, and the Delaware Court of Chancery held that New Jersey decisions interpreting analogous provisions would be treated as precedential. *Wilm. City Ry. Co. v. People's Ry. Co.*, 47 A. 245, 253 (Del. Ch. 1900).

- "This means that *our corporation law does not permit* actions or agreements by stockholders which would take all power from the board to handle matters of substantial management policy."[163]

- "So long as the corporate form is used as presently provided by our statutes *this Court cannot give legal sanction* to agreements which have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters."[164]

- "Nor is this, as defendants urge, merely an attempt to do what the parties could do in the absence of such an Agreement. Certainly the stockholders could agree to a course of persuasion *but they cannot under the present law commit the directors to a procedure which might force them to vote contrary to their own best judgment*."[165]

These are not statements about provisional validity. They describe an arrangement that is statutorily void as a violation of public policy.

Finally, although Chancellor Seitz did not use the word "void" at the trial level, the Delaware Supreme Court did on appeal. Chancellor Seitz held that the provisions in the agents' agreement governing director action violated the predecessor to Section 141(a), but he rejected the argument that provisions related to stockholder action were void as a statutorily non-compliant voting trust.[166] On appeal, the Delaware Supreme Court described the issue on which Chancellor Seitz ruled as whether "[c]ertain provisions of the Agents' Agreement attempting to control directorate

---

[163] *Abercrombie*, 123 A.2d at 898 (emphasis added).

[164] *Id.* at 899 (emphasis added).

[165] *Id.* at 900 (emphasis added).

[166] *Id.* at 904 ("The Agreement is therefore not invalid for failure to comply with the Delaware Voting Trust statute."). He reiterated those points in a decision addressing the form of order. *See Abercrombie v. Davies*, 125 A.2d 588 (Del. Ch. 1956).

66

action 'are invalid on their face.'[167] They understood the ruling to address a facial voidness challenge.

But the justices did not reach the issue on which Chancellor Seitz ruled because they held that the agents' agreement was void in its entirety as a statutorily noncompliant voting trust. The defendants argued hypothetical legal significance, but the Delaware Supreme Court held that "voting trusts derive their validity solely from the statute" and "[t]he test of validity is the rule of the statute."[168]

The justices concluded that the agents' agreement was therefore "illegal" and "void."[169] If the Chancellor had held the director-related sections voidable, then the justices would have reversed the Chancellor's ruling in its entirety. Instead, they left his ruling on the director-related provisions intact, recognizing that Chancellor Seitz held them void.[170]

---

[167] *Abercrombie*, 130 A.2d at 341.

[168] *Id*. at 344 (emphasis omitted).

[169] *Id*. at 347; *see Bank of Am. Corp.*, 2009 WL 851492, at *66 ("The Delaware courts have repeatedly held that where the General Corporation Law provides that a particular type of voting or governance mechanism may be implemented by a certificate of incorporation provision and does not specify some other means of implementation, then the only means of implementing such mechanism is by a certificate of incorporation provision.").

[170] *Abercrombie* 130 A.2d at 347 ("The cause is remanded to the Court of Chancery of New Castle County, with instructions to vacate paragraphs (2) to (5) inclusive of the order of October 24, 1956, and to enter a further order consistent with this opinion, with such provisions for injunctive relief, if any, as the Chancellor may determine to be appropriate."). On remand, the Chancellor left his original order intact as to the director provisions. *Abercrombie v. Davies*, 131 A.2d 822, 826 (Del.

67

In the appeal in *Moelis*, company counsel argued that Chancellor Seitz necessarily held that the director provisions were voidable, not void, claiming that Chancellor Seitz rejected an unclean hands argument because its requirements were not satisfied, not because the defense could not validate a void act.[171] Chancellor Seitz wrote:

> Nor do I see any merit to defendants' argument that plaintiffs have no standing to attack the Agreement because of their unclean hands. If, as defendants say, plaintiffs are seeking to vary some alleged understanding among the founders of American including plaintiffs concerning its future control *that does not preclude plaintiffs from showing the illegality of this Agreement*.[172]

Chancellor Seitz thus said exactly the opposite of what Moelis's counsel claimed. He said that even if the plaintiffs had unclean hands, that would not preclude them from arguing illegality. In other words, the plaintiffs could argue the provisions were void because, if they were, equitable defenses like unclean hands would not apply.

*Abercrombie* thus held the director-related provisions of the agents' agreement incurably void, not provisionally effective yet voidable, defensible, or fixable. But the director-related provisions in the agents' agreement could have been implemented

---

Ch. 1957) ("I might note that the Court cannot agree with plaintiffs' proposed form of order to the extent it purports to strike the former order in its entirety. The revised order must be entered in accordance with the direction of the Supreme Court.").

[171] *Moelis Supreme*, Case No. 340, 2024, Dkt. 24 at 4 (claiming that "the court rejected [the unclean hands] defense only because it found the elements unsatisfied").

[172] *Abercrombie*, 123 A.2d at 896 (emphasis added).

through the charter. After *Moelis Supreme*, it is hard to see how Chancellor Seitz's decision in *Abercrombie* remains good law.

Relying on *Abercrombie*, pre-*Moelis Supreme* decisions consistently held that non-charter-based limitations on board power violated Section 141(a).[173] Most of the seventeen precedents discussed in *Moelis Merits* did not use the term "void" or the term "voidable," preferring terms like "invalid."[174] As with *Abercrombie*, however, those decisions treated non-charter-based provisions that interfered with a board's authority as contrary to a strong Delaware public policy, implying that they were incurably void. *Quickturn II* exemplifies their tenor:

> One of the most basic tenets of Delaware corporate law is that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. Section 141(a) requires that any limitation on the board's authority be set out in the certificate of incorporation. The Quickturn certificate of incorporation contains no provision purporting to limit the authority of the board in any way. The Delayed Redemption Provision, however, would prevent a newly elected board of directors

---

[173] *Moelis Merits*, 311 A.3d at 831–55 (discussing Section 141(a) precedents).

[174] One exception is *Jackson v. Turnbull*, which referred to a merger agreement in which the board delegated its duty to set the merger consideration in violation of Sections 141(a) and 251(b) as "void." 1994 WL 174668, at *6 (Del. Ch. Feb. 8, 1994) ("Based upon the foregoing, I find that the L'Nard/Restorative merger is void and that the consents exercised on July 12, 1993 validly removed all of L'Nard's directors except Jackson."), *aff'd*, 653 A.2d 306 (Del. 1994) (TABLE). The court also used "invalid," treating it as a synonym for "void." *Compare id.* at *1 ("I conclude that the merger was invalid.") *with id.* at *6 ("I find that the . . . merger is void."). *Politan* also used the word "void." *E.g.*, *Politan*, C.A. No. 2022-0948, at 182 (Del. Ch. Feb. 3, 2023) (TRANSCRIPT) ("[P]utting all of these points together, they do state a reasonably conceivable claim that the provision is void, *ultra vires*, and/or some form of waste and require me to deny the motion to dismiss."); *id.* at 185 ("I conclude it is reasonably conceivable that the Director Change of Control Provision is void *ab initio* and that laches, therefore, does not apply.").

from *completely* discharging its fundamental management duties to the corporation and its stockholders for six months. While the Delayed Redemption Provision limits the board of directors' authority in only one respect, the suspension of the Rights Plan, it nonetheless restricts the board's power in an area of fundamental importance to the shareholders—negotiating a possible sale of the corporation. Therefore, we hold that the Delayed Redemption Provision is invalid under Section 141(a), which confers upon any newly elected board of directors *full* power to manage and direct the business and affairs of a Delaware corporation.[175]

That passage does not suggest that the deferred redemption feature was voidable. It was invalid in the sense of void.

Until *Moelis Supreme*, the decisions in the Section 141(a) canon also did not apply concepts like the doctrine of hypothetical legal significance. *Carmody* illustrates the pre-*Moelis Supreme* approach. The complaint challenged the dead-hand feature in a stockholder rights plan that only permitted the directors who were in office before the rights deployed to redeem them. Justice Jacobs, then a Vice Chancellor, reasoned that any differences among directors as to their voting rights and powers had to be in the charter.[176] But although that meant the corporation hypothetically could have accomplished the outcome it sought to achieve, Justice Jacobs did not view that possibility as rendering the rights plan provisionally effective albeit voidable, defensible, or fixable. He ruled instead that "because it is

---

[175] *Quickturn II*, 721 A.2d at 1291–92 (footnotes omitted).

[176] *Carmody,* 723 A.2d at 1190–92 (explaining that Section 141(a) requires "that limitations upon the directors' power be expressed in the corporation's charter" and that the certificate did not contain any limitations).

claimed that the Rights Plan's allocation of voting power to redeem the Rights is nowhere found in the Toll Brothers certificate of incorporation, the complaint states a claim that the 'dead hand' feature of the Rights Plan is *ultra vires,* and hence, statutorily invalid under Delaware law."[177]

After *Moelis Supreme*, it is hard to see how the decisions in the Section 141(a) canon remain good law on the issue of voidness. The new doctrine of hypothetical legal significance implicitly abrogates their reasoning.[178]

---

[177] *Id.* at 1191. Justice Jacobs rejected an explicit attempt at hypothetical legal significance. The corporation contended that the plan's empowerment of continuing directors functioned like a board committee. Justice Jacobs rejected that argument as having "no basis in fact" because "the board did not, nor did it purport to, create a special committee having the exclusive power to redeem the pill." *Id.* at 1192.

[178] That outcome carries significance for legal opinions that rely on *Abercrombie*, *Quickturn II*, and other precedents in the Section 141(a) canon. Many of the opinions are available as exhibits in support of no-action letters. Searching the Westlaw SEC No-Action Letters database using the query "141(a) & Abercrombie & ('Morris Nichols' 'Richards Layton' 'Potter Anderson')" yields 188 results. Replacing "Abercrombie" with "(Abercrombie Quickturn)" yields 238 results. Adding more Section 141(a) precedents does not appreciably increase the yield.

*Moelis Supreme* raises questions about the doctrinal underpinning for those opinions. Take a bylaw that restricts the board's ability to take action in a manner comparable to the Moelis Pre-Approval Requirements, Moelis Vacancy Provision, or Moelis Recommendation Provision. Practitioner legal opinions traditionally tracked *Moelis Merits* in treating such a bylaw as contrary to Section 141(a) and hence unable to operate validly at all. In other words, the opinions treated those bylaws as void. But after *Moelis Supreme*, those bylaws are *not* void, because under the doctrine of hypothetical legal significance, the bylaws could be implemented through the charter. Not only that, but as *Moelis Supreme* reiterates, voidable acts are subject to stockholder ratification or "cure by shareholder approval." *Moelis Supreme*, 2026 WL 184868, at *7. Does that suggest that such a bylaw might now be a suitable topic for stockholder action?

#### d. A More Contractarian Test For The Contractarian Era

A final benefit of *Moelis Supreme* is to update Delaware's test for voidness to better fit the contractarian era. Since 2022, the Delaware Supreme Court has proclaimed Delaware's contractarian bona fides with increasing insistence.[179]

The Governance Agreement Amendment sidestepped that conundrum. It adopted a version of hypothetical legal significance by providing a corporation has the power, "[n]otwithstanding § 141(a)" to "make contracts with 1 or more current or prospective stockholders (or 1 or more beneficial owners of stock), in its or their capacity as such," and that a governance agreement under that provision could contain any type of pre-approval right, veto right, or covenant "provided that no provision of such contract shall be enforceable against the corporation to the extent such contract provision is contrary to the certificate of incorporation or would be contrary to the laws of this State (other than § 115 of this title) if included in the certificate of incorporation." 8 *Del. C.* § 122(18). But the statute limited its effect to contracts "in exchange for such minimum consideration as determined by the board of directors (which may include inducing stockholders or beneficial owners of stock to take, or refrain from taking, 1 or more actions)." *Id.* That qualification enabled practitioners to continue to opine that stockholder-proposed bylaws were facially invalid under Section 141(a), because they were not agreements supported by minimum consideration. *E.g.*, *Fortinet*, 2026 WL 1217034, at *9; *Gen. Dynamics*, 2026 WL 1244814, at *9; *McDonald's*, 2026 WL 1274960, at *9.

*Moelis Supreme* does not limit its version of hypothetical legal significance to governance agreements supported by consideration. Building on a rule statement from *Nevins*, a case that did not involve a governance agreement, *Moelis Supreme* implicitly adopts hypothetical legal significance as the general test for determining when a corporate act is void.

[179] *E.g.*, *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 487 (Del. 2024) ("Delaware is a contractarian state that holds parties' freedom of contract in high regard."); *XRI Supreme*, 304 A.3d at 919 (citing the "strong contractarian policies embedded in Delaware law generally"), *abrogated on other grounds by* 85 Del. Laws ch. 47, § 2 (2025); *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 355 (Del. 2022) ("Delaware is a contractarian state."), *abrogated in part on other grounds by* 84 Del. Laws ch. 98, § 12 (2023).

Contractarianism strives to promote predictability and stability,[180] but not by enforcing substantive rules external to the parties' relationship. Contractarianism

---

The judicial embrace of the concept and connotations of contractarianism is relatively recent. Based on a Westlaw search, and setting aside a handful of citations to articles that used "contractarian" in their titles, the Court of Chancery first used the term substantively in 2010. *See Ashall Homes Ltd. v. ROK Ent. Gp. Inc.*, 992 A.2d 1239, 1254 n.71 (Del. Ch. 2010). Not until the following year did the Court of Chancery assert that Delaware law "is more contractarian than that of many other states." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011). The Delaware Superior Court first deployed the concept in 2020. *See AssuredP'rs of Va., LLC v. Sheehan*, 2020 WL 2789706, at *15 (Del. Super. May 29, 2020). The *Stream TV* decision in 2022 marked its first appearance in a Delaware Supreme Court opinion.

In corporate law, contractarianism often adopts the nomenclature of private ordering. *See Maffei v. Palkon*, 339 A.3d 705, 744 (Del. 2025); *Manti Hldgs.*, 261 A.3d at 1216–18; *Salzberg*, 227 A.3d at 116, 137. Private ordering as a synonym for contractarianism arguably differs from the concept of private ordering originally embodied in general corporation laws. Under that view of private ordering, corporate planners could achieve a wide range of outcomes by deploying statutory tools and following statutory procedures, but there were limits, particularly on how results could be achieved. *See* Bayless Manning, *The Shareholder's Appraisal Remedy: An Essay for Frank Coker*, 72 Yale L.J. 223 (1962) (using the appraisal remedy to survey distinctions between types of fundamental transactions; criticizing the different rules as arbitrary and reflecting nineteenth and early twentieth century concepts that continued to appear in general corporation laws). Contemporary contractarianism more closely reflects the everything-is-contract-law fundamentalism of the Chicago School and its theory of the corporation as a nexus of contracts. Mohsen Manesh, *The Corporate Contract and the Internal Affairs Doctrine*, 71 Am. U. L. Rev. 501, 526–34 (2021); *see* Thomas Lee Hazen, *The Corporate Persona, Contract (and Market) Failure, and Moral Values*, 69 N.C. L. Rev. 273, 284–85 (1991) (summarizing and criticizing Chicago School approach); William W. Bratton, Jr., *The New Economic Theory of the Firm: Critical Perspectives from History*, 41 Stan. L. Rev. 1471, 1476–82, 1498–1501 (1989) (same).

[180] *See Stream TV*, 279 A.3d at 354–55 ("[E]nforcing the unambiguous Charter provision is consistent with our policy of seeking to promote stability and predictability in our corporate laws, and with recognition that Delaware is a contractarian state." (footnotes omitted)).

deploys a set of meta-rules derived from contract law to enforce agreed-upon

governance frameworks.[181] Contractarianism offers predictability of result by

---

[181] Unlike contract law, corporate contractarianism treats meaningfully less significant indications of consent as sufficient for contract formation. *See* Verity Winship, *Shareholder Litigation by Contract*, 96 B.U. L. Rev. 485, 495–96 (2016) (noting that "[h]ow closely . . . corporate organizational documents approach robust ideas of consent depends on the type of document and when a particular provision is adopted" (footnote omitted)). A provision in a pre-IPO charter does not receive express approval from the publicly held shares. Holders of shares become bound when they buy shares, making their consent implicit. The same is true in a private company for the original charter. *See* Helen Hershkoff & Marcel Kahan, *Forum-Selection Provisions in Corporate "Contracts"*, 93 Wash. L. Rev. 265, 269 (2018) (describing this form of implied consent). The adoption of a midstream charter amendment means that holders of a majority of the outstanding voting power have consented to it, which indicates some level of consent. 8 *Del. C.* § 242(b). But "any shareholder who did not vote in favor of the mid-stream amendment did not consent *at all*. . . . At most, such a shareholder consented to the *rules* for changing [the] charter . . . (to the extent these rules were established when the company initially sold the shares)." Hershkoff & Kahan, *supra*, at 282; *see* Randall S. Thomas, *What Should We Do About Multijurisdictional Litigation in M&A Deals?*, 66 Vand. L. Rev. 1925, 1953–54 (2013) (describing this form of consent). Under the DGCL, a bylaw amendment provides ambiguous indications of consent. The board and the stockholders can typically each adopt, amend, alter, or repeal bylaws unilaterally. *See* 8 *Del. C.* § 109(a). If a board implements a bylaw, then stockholders are bound without any affirmative act of consent, other than having accepted the rules for amendment. Browning Jeffries, *The Plaintiffs' Lawyer's Transaction Tax: The New Cost of Doing Business in Public Company Deals*, 11 Berkeley Bus. L.J. 55, 95–98 (2014) (noting that although "corporate bylaws and charters have frequently been analogized to contracts[,] . . . the analogy to a contractual relationship weakens" in light of the fact that "the bylaws can be adopted or amended unilaterally by the board without shareholder consent"). None of these forms of consent resemble what contract law traditionally contemplates. *See* Ann M. Lipton, *Manufactured Consent: The Problem of Arbitration Clauses in Corporate Charters and Bylaws*, 104 Geo. L.J. 583, 608 (2016) ("The legal framework for the corporation therefore does not resemble anything like the legal framework for contracting parties . . ."); Jill E. Fisch, *Governance by Contract: The Implications for Corporate Bylaws*, 106 Cal. L. Rev. 373, 381, 409 (2018) (describing the contractarian approach to charters and bylaws as "a powerful endorsement of contractual freedom in corporate law" while questioning whether Delaware decisions "may stretch the contract analogy too far").

enforcing those frameworks, rather than constraining them with mandatory statutory or common law overlays. Predictability in this sense does not mean treating like situations alike, because parties can contract for different results in like situations. Predictability means transaction planners get the result they sought. Similarly, stability in this sense does not mean generating the same outcomes across time, because again, parties can contract for different results across time. Stability means the law does not upset the frameworks that transaction planners have developed. Moving beyond constraining precedents like *Triplex*, *Waggoner*, *STAAR Surgical*, and the Section 141(a) canon furthers stability and predictability in the contractarian sense.

*Moelis Supreme* makes several contractarian moves. First, it links the standard for evaluating contractual illegality with the standard for assessing the validity of internal corporate governance arrangements.[182] Black-letter sources previously called for distinguishing between the two.[183] Contractual illegality implicates the traditional common law concepts of *malum in se* and *malum*

---

[182] *See Moelis Supreme*, 2026 WL 184868, at *6 (stating that the distinction between acts *malum in se* and *malum prohibitum* is "implicit in our decisions that differentiate void from voidable contracts in the corporate-governance context").

[183] *See generally* 7A Fletcher Cyc. Corp. § 3400 ("Illegal" acts or contracts distinguished from ultra vires acts).

*prohibitum.*[184] That law forms part of general contract law[185] and "is not peculiar to corporations."[186] *Moelis Supreme* uses the distinction between *malum in se* and *malum prohibitum* as the starting point for its voidness test.[187]

Second, *Moelis Supreme* introduces the doctrine of hypothetical legal significance. Together with the doctrine of independent legal significance, that concept furthers the goals of predictability and stability in the contractarian sense by permitting corporate practitioners to defend against a wide array of statutory challenges. The doctrine of independent legal significance means that transaction planners need only comply with the requirements in the DGCL that govern the path

---

[184] *See id.* § 3583 (Kinds of illegal contracts) (describing illegal contracts as sometimes classified using the concepts of "malum prohibitum" and "malum in se").

[185] *See Sersun v. Morello*, 1999 WL 350476, at *2 (Del. Ch. Mar. 29, 1999) ("When a contract is validly made, it cannot be modified without the consent of all parties and an exchange of consideration."); *Lowe v. Bennett*, 1994 WL 750378, at *3 (Del. Super. Dec. 29, 1994) ("Generally, no modification is valid without mutual consent and consideration."); *Egan & Sons Air Conditioning Co. v. Gen. Motors Corp.*, 1988 WL 47314, at *11 (Del. Super. Apr. 27, 1988) ("In Delaware, the consent of both parties and some consideration are required to support a modification."); *De Cecchis v. Evers*, 174 A.2d 463, 464 (Del. Super. 1961) ("A contract having been made, no modification of it could be brought about without the consent of both parties and without consideration."). *See generally Safeway, Inc.*, 2002 WL 571774, at *14 (S.E.C. No-Action Letter Mar. 18, 2002).

[186] 7A Fletcher Cyc. Corp. § 3508 (Illegal corporate contracts—Definition and scope).

[187] *See Moelis Supreme*, 2026 WL 184868, at *6.

76

they chose,[188] while the doctrine of hypothetical legal significance enables transaction planners to defend against charges of non-compliance by invoking paths they did not choose.[189] The combination reduces the possibility of judicial invalidation.

Third, *Moelis Supreme* advances contractarianism because hypothetical legal significance makes the DGCL's altering rules more flexible.[190] Under the contractarian concept of the corporation, the firm is a nexus of contracts that can freely alter default rules. Under the DGCL, however, some default rules are easier to modify than others. A default rule that the charter, bylaws, or a governance agreement can alter is looser than a default rule that only the charter can alter. The doctrine of hypothetical legal significance makes a charter-only altering rule like the

---

[188] *See* Bigler & Rohrbacher, *supra*, at 19 (providing examples in which courts held a transaction valid under one statutory path even though it would be forbidden under a different statutory path). "For example, a stock split may be effected in two different ways. A corporation may either (1) amend its certificate of incorporation under section 242 of the DGCL to subdivide the outstanding shares into a greater number of shares or (2) issue the new stock as a dividend under section 170. The stock split would require a stockholder vote if effected as an amendment, but not if effected as a dividend declared by the board. If a corporation effects the stock split by declaring a stock dividend under section 170, under [the doctrine of independent legal significance] the courts would not require the stockholder vote that would have been required if the stock split had been effected as a subdivision of the outstanding shares under section 242." *Id.* at 1–2 (footnote omitted).

[189] Using the stock split example from the prior footnote, the doctrine of hypothetical legal significance seems to allow a corporation that chooses to proceed under Section 242 but fails to obtain the necessary vote to argue that it could have achieved its aim without a vote under Section 170, rendering the transaction voidable rather than void and bringing equitable defenses and ratification into play.

[190] *See* Brett H. McDonnell, *Sticky Defaults and Altering Rules in Corporate Law*, 60 SMU L. Rev. 383 (2007) (discussing altering rules).

Board Power Exception more supple, because failing to follow the charter-only altering rule does not render the non-compliant act void; the non-compliant act is instead provisionally effective albeit voidable, defensible, or fixable. In *Moelis Supreme*, the combination of hypothetical legal significance plus laches validated the challenged provisions, despite the Board Power Exception's charter-only altering rule.[191]

Last, *Moelis Supreme*'s endorsement of each of the challenged provisions in the Moelis Agreement suggests greater opportunities for fiduciary tailoring.[192] Although *Moelis Supreme* did not endorse any provision specifically, the decision held that each of the challenged provisions—including the Moelis Recommendation Provision and the Moelis Vacancy Provision—could have been implemented through the charter.

As a practical matter, those provisions had no impact if the Moelis board was already acting consistent with what Partners wanted. Just as law's sanction is irrelevant to Justice Holmes' good man and only matters to the bad man who would

---

[191] Hypothetical legal significance may operate most powerfully for provisions that appear in a corporation's governing documents when the firm goes public. Moelis argued that all of its stockholders acquiesced to the Moelis Agreement and its contents by buying shares in its IPO or acquiring them in the market. *Moelis Justiciability* rejected that argument, relying on the proposition that affirmative defenses cannot validate void acts. 310 A.3d at 1000–01. After *Moelis Supreme*, similar provisions are not void, but voidable. IPO-based acquiescence may now be a defense.

[192] *See generally New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 539–66 (Del. Ch. 2023) (discussing paths for fiduciary tailoring).

not act without it,[193] so too are the contractual constraints on the Moelis board insignificant when Moelis and Partners agree. The provisions could only operate as contractual constraints when the Moelis board wanted to take action that Partners wanted to block.[194]

---

[193] *See* Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 459 (1897) ("If you want to know the law and nothing else, you must look at it as a bad man, who cares only for the material consequences which such knowledge enables him to predict, not as a good one, who finds his reasons for conduct, whether inside the law or outside of it, in the vaguer sanctions of conscience."). For those more philosophically inclined, consider Rousseau's explanation that the compulsion to follow the social compact only becomes visible when a subject wants to enjoy the rights of citizenship without fulling the duties. *See* Jean-Jacques Rousseau, *On the Social Contract*, bk. I, ch. 7, ¶ 7 (1762) (G.D. H. Cole trans.). "In order then that the social compact may not be an empty formula, it tacitly includes the undertaking, which alone can give force to the rest, that whoever refuses to obey the general will shall be compelled to do so by the whole body. This means nothing less than that he will be forced to be free . . . ." *Id.* ¶ 8.

[194] *See AFSCME*, 953 A.2d at 239–40 (addressing bylaw that required board to reimburse proxy expenses and which therefore only forced board action in a setting where the board had decided that proxy expenses should not be reimbursed; holding that bylaw could not operate permissibly under Section 141(a)); *Moelis Merits*, 311 A.3d at 869–70 ("There is no need to enforce contractual restrictions when the counterparty is already doing what you want. The only setting when Moelis would need to enforce one of the Pre-Approval Requirements is if the Board was committed to taking action that Moelis rejected. In every setting where Moelis enforces one of the Pre-Approval Requirements, the provision will operate invalidly to constrain the Board."); *id.* at 872 ("[T]he Recommendation Requirement cannot operate permissibly. If the Board already supports Moelis' designees, then the Recommendation Requirement is not doing any work. The Recommendation Requirement does work when the Board opposes one or more of Moelis' designees."); *id.* at 873 ("As with the Recommendation Requirement, the Vacancy Requirement only operates when Moelis and the Board disagree on who should fill a vacancy. Any board can choose to fill a vacancy with a candidate whom the CEO and Chairman suggests. If the Board decides voluntarily to fill a vacancy with someone Moelis proposes, then the Vacancy Requirement is not compelling the directors to act. The Vacancy Requirement only has teeth if the Board disagrees.").

The challenged provisions therefore could only come into play when they interfere with the directors' efforts to exercise board power in compliance with their fiduciary duties. Prior Delaware precedent took a dim view of provisions that constrained compliance with fiduciary duties,[195] but *Moelis Supreme* held that all of the challenged provisions could be implemented under Section 102(b)(1) and that the result did not violate Delaware public policy. Fiduciary tailoring makes that possible.

*Moelis Supreme* thus implicitly recognizes substantial opportunities for fiduciary tailoring, taking a further step toward a more contractarian approach to corporate law.

### 7.    Applying *Moelis Supreme* To The Pubco Agreement

Under *Moelis Supreme*, the governance provisions in the Pubco Agreement are voidable. Voidness is not an impediment to settlement approval.

---

[195] *E.g.*, *AFSCME*, 953 A.2d at 239 (holding bylaw facially invalid where it would "prevent the directors from exercising their full managerial power in circumstances where their fiduciary duties would otherwise require them to deny reimbursement to a dissident slate"); *Quickturn II*, 721 A.2d at 1292 ("to the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable" (cleaned up)); *QVC Network*, 637 A.2d at 51 (same); *Marmon*, 2004 WL 936512, at *5 ("Arbinet's directors were not free to contract away disclosure obligations that they had a fiduciary duty to observe."); *Grimes I*, 1995 WL 54441, at *9 (recognizing that a board "may not either formally or effectively abdicate its statutory power and its fiduciary duty to manage or direct the management of the business and affairs of this corporation"); *ACE*, 747 A.2d at 106 (refusing to enforce a no-talk provision that "involves an abdication by the board of its duty to determine what its own fiduciary obligations require at precisely that time in the life of the company when the board's own judgment is most important").

The Pubco Agreement contained six pre-approval requirements. As a general matter, after *Moelis Supreme*, the court need not evaluate the constraints collectively. The court also need not consider the granularity of control they provide. Nor is the Dead-Hand Problem a concern.

The first Pubco Pre-Approval Requirement addressed mergers, sales of all or substantially all assets, and material dispositions. The third addressed charter amendments. All raised concerns about encroachments into potentially core areas of board authority and departures from a statutorily prescribed sequence that contemplates the board as the transactional gatekeeper. *Moelis Supreme* held that similar provisions were permissible as charter-based constraints and hence voidable, not void. The same reasoning applies here.

The second Pubco Pre-Approval Requirement addresses the issuance of securities, and the fourth addresses entering into material new lines of business. The fifth addresses changes in the size of the Pubco board. Those provisions do not implicate any specific concerns beyond a general conflict with Section 141(a). *Moelis Supreme* held that similar provisions were voidable, not void. The same reasoning again applies.

The last Pubco Pre-Approval Requirement involved employment decisions for senior officers. The DGCL authorizes officer selection in accordance with the

bylaws,[196] and any provision that can legitimately appear in the bylaws can appear in the charter.[197] It is therefore voidable and not void.

The settlement reduces the scope of the Pubco Pre-Approval Requirements addressing board-initiated bylaw amendments, new lines of business, and senior officer issues. Under *Moelis Supreme*, even the unmodified provisions were not void, and the restrictions limit them. The scope of the other approval requirements remains the same. All of the provisions are voidable, not void.

The Pubco Agreement included the Pubco Board-Majority Right, which entitled the Holders to nominate a majority of the board. Its implications were similar to the Moelis Recommendation Provision, in that it appeared to require the directors to support the Holders' nominees regardless of their views. *Moelis Supreme* held that the Moelis Recommendation Provision could be validly implemented through the charter. The same reasoning applies to the Pubco Board-Majority Right. Although the settlement cut back on its scope, the provision was already voidable, not void.

The Pubco Agreement also contained the Pubco Chair-Designation Right. In operation, the Pubco Chair-Designation Right resembles the Moelis Vacancy Provision because it forces the directors to accept a chair they did not select. Under

---

[196] 8 *Del. C.* § 142.

[197] *Id.* § 102(b)(1) ("Any provision which is required or permitted by any section of this chapter to be stated in the bylaws may instead be stated in the certificate of incorporation[.]").

*Moelis Supreme*, the Pubco Chair-Designation Right could have appeared in the charter and therefore was not void.

*Moelis Supreme* thus eliminates any voidness problem with the provisions in the Pubco Agreement. Voidness is no longer an impediment to settlement approval.

## B. Meritorious When Filed

Although the foregoing analysis eliminates the voidness hurdle, it creates another. To guard against collusive settlements, a plaintiff who proposes a settlement must have asserted a claim that was meritorious when filed. A claim is meritorious under this standard "if it can withstand a motion to dismiss on the pleadings."[198]

Under *Moelis Supreme*, the complaint in this case could not have withstood a motion to dismiss. All of the challenged provisions would have been held voidable, not

---

[198] *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1996). In *Chrysler*, the Delaware Supreme Court contemplated the plaintiff also possessing "knowledge of provable facts which hold out some reasonable likelihood of ultimate success." *Id.* That standard has been equated with Rule 12(b)(6). *See In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 639 (Del. Ch. 2005). The standard does not mean that a court must conduct a Rule 12(b)(6) analysis before approving a settlement. "One can easily imagine situations when it is highly debatable whether a complaint would survive a motion to dismiss and the uncertainty of that proposition is what drove a favorable settlement for the class." *Id.* But it does mean that a facially defective claim cannot support a mootness fee or a settlement. *See Allied Artists Pictures Corp.*, 413 A.2d at 879 ("The opinions in the above-cited cases have insisted that a settled or mooted action, in order to form the basis for an award to counsel, must have been meritorious when filed. At least one commentator has suggested that as long as there can be shown a causal connection between the suit and the benefit, e.g., the defendant took it seriously enough to want to settle or take mooting action, it should not matter whether the suit had legal merit. But this Court has been concerned with discouraging baseless litigation and has adhered to the merit requirement." (citations omitted)).

void, and laches would have barred the lawsuit. That would mean that the plaintiff's claims could not support a settlement, and the renewed motion for settlement approval should be denied.

*Wagner Supreme* addresses this issue. The corporate defendant in *Wagner* made changes to its governance agreement in response to the plaintiff's complaint while defending other provisions. *Wagner Chancery* held that some of the unmodified provisions were void. On appeal, the plaintiff conceded that after *Moelis Supreme*, all of the unmodified provisions were voidable, not void, such that laches barred the suit. But the plaintiff argued that they could still recover a mootness fee for conferring benefits on the corporation and its stockholders through the amendments to the governance agreement.

Just as only a meritorious complaint can support a settlement, so too only a meritorious complaint can support a mootness fee.[199] The corporation in *Wagner* argued that if the justices applied *Moelis Supreme* and reversed on voidability, then the plaintiff's complaint was not meritorious when filed and could not support a fee award. *Wagner Supreme* disagreed. Although the high court reversed *Wagner Chancery* under the test articulated in *Moelis Supreme*, the Delaware Supreme Court acknowledged the novelty of the test, holding that "[a]t the time Wagner filed suit, she had a meritorious facial invalidity claim that certain stockholders agreement

---

[199] *Chrysler*, 223 A.2d at 387.

84

provisions were void."[200] The justices therefore remanded the case so that this court could craft a mootness fee.[201]

The reasoning in *Wagner Supreme* applies to the settlement. If *Moelis Supreme* had been the law when the plaintiff filed the complaint, then the complaint would not have stated a claim on which relief could be granted, and the action could not support a settlement. But as *Wagner Supreme* acknowledged, facial voidness challenges to governance agreements like the Pubco Agreement were meritorious when filed. They only became meritless after *Moelis Supreme*. Here, the parties settled before *Moelis Supreme* rendered the plaintiff's claims non-viable.

The plaintiff's claims were thus meritorious when filed. They can support a settlement.

## C. Class Certification

The settlement contemplates class certification. Under Rule 23, certification "is a two-step process, which requires that the purported class meet all four criteria within Court of Chancery Rule 23(a) and at least one of the criteria within Court of Chancery Rule 23(b)."[202] The proposed class consists of Pubco's Class A stockholders

---

[200] *Wagner Supreme*, 2026 WL 1256588, at *2 (citing *Allied Artists Pictures Corp.*, 413 A.2d at 879 ("[T]he meritoriousness determination should be made with reference to the state of the action at the time of filing.")).

[201] *Id.*

[202] *In re Ebix, Inc. S'holder Litig.*, 2018 WL 3570126, at *1 (Del. Ch. July 17, 2018).

on the date of the settlement (the "Class"). As defined, the Class meets all of the requirements for certification.

Rule 23(a)(1) provides that the members of a proposed class must be "so numerous that joinder of all members is impracticable."[203] Pubco has over 24 million shares of Class A common stock outstanding, held by many record and beneficial owners. Numerosity is satisfied.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."[204] Because this action asserts claims that implicate the interests of all stockholders in the Class in the same way, commonality is satisfied.

Rule 23(a)(3) requires that the class representative's claims be "typical of the claims or defenses of the class."[205] The plaintiff is a stockholder whose claims arise out of the same alleged wrong as other stockholders. The plaintiff did not face any unique defenses or possess any distinct claims that could make the plaintiff atypical.

Rule 23(a)(4) requires that the class representative will "fairly and adequately protect the interests of the class."[206] The plaintiff was a member of the Class, had no conflicts of interest, and hired competent counsel capable of pursuing the litigation.

---

[203] Ct. Ch. R. 23(a)(1).

[204] *Id.* 23(a)(2).

[205] *Id.* 23(a)(3).

[206] *Id.* 23(a)(4).

Rule 23(b)(1)(A) provides for class certification where the prosecution of separate actions would create a risk of inconsistent or varying adjudications. If class members pursued their claims individually, they could obtain different adjudications, impose conflicting governance demands on Pubco, and generate inequitable and incompatible results.

Certification under Rule 23(b)(2) is appropriate when defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole."[207] The Pubco Agreement affected everyone in the Class in the same way, making final declaratory relief appropriate as to the Class as a whole.

The plaintiff has also satisfied the procedural requirements in Rule 23(aa) and (e). The Class is therefore certified under Rules 23(b)(1) and (b)(2) with the named plaintiff as the class representative and plaintiff's counsel as class counsel.

## D.    Adequacy Of Notice

Court of Chancery Rule 23(f)(3) requires that notice of a proposed class action settlement be provided to stockholders "in the manner directed by the Court."[208] The court determined it was adequate to provide notice through (a) publication in the Investor's Business Daily, (b) Pubco posting the Notice in the "Investors" section of its website, and (c) Pubco issuing a Form 8-K filed with the U.S. Securities and

---

[207] *Id.* 23(b)(2).

[208] *Id.* 23(f)(3).

Exchange Commission. The plaintiff and Pubco provided notice as directed and in compliance with Rule 23(f)(3). Adequate notice was provided.

## E. The Adequacy Of The Settlement

Perhaps the most important task that the court has when considering a settlement in a representative action is to evaluate the adequacy of the consideration. Under Rule 23(f)(5)(D), the court must determine that "the relief provided for the class falls within a range of reasonableness."[209] That inquiry calls upon the court

> To determine whether the settlement falls within a range of results that a reasonable party in the position of the plaintiff, not under any compulsion to settle and with the benefit of the information then available, reasonably could accept. In this sense, the Court's task is analogous to that of an attorney (also a fiduciary) who is asked by a client whether a settlement seems reasonable. The ultimate decision whether or not to settle rests with the client—indeed, it falls within the client's "business judgment"—but the lawyer appropriately can apply legal knowledge and experience to make an assessment of the likely outcomes so as to advise the client on whether the settlement is one that the lawyer believes the client legitimately could accept.[210]

The court thus "weigh[s] the 'give' against the 'get' to ensure the class is reaping a reasonable benefit alongside the representative plaintiff."[211] If the settlement falls within a range of reasonableness, then it should be approved.

---

[209] *Id.* 23(f)(5)(D).

[210] *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2013 WL 458373, at *2 (Del. Ch. Feb. 6, 2013).

[211] *AMC*, 2023 WL 5165606, at *18.

Rule 23(f)(5)(D) calls on the court to consider (i) the strength of the claims, (ii) the costs, risks, and delay of trial and appeal; (iii) the scope of the release; and (iv) any objections to the proposed dismissal. There were no objections to the settlement.

The claims in this action were meaningful. The complaint was the first to challenge a new-wave governance agreement, although the *Moelis* litigation ended up being the case in which this court issued the first trial-level decisions and where the Delaware Supreme Court ultimately ruled in *Moelis Supreme*. Under the traditional standards governing Section 141(a), the claims had substantial merit, but they would have had to overcome then-Vice Chancellor Strine's call for dispensing with the Section 141(a) inquiry in *Sample v. Morgan*.[212] Because of the passage of time, Pubco could assert a meaningful laches defense, which ultimately prevailed on appeal in *Moelis Supreme* and *Wagner Supreme*. As shown by the enactment of the Governance Agreement Amendment, the case presented substantial issues of public policy. Had the plaintiff proceeded without a settlement, then the litigation would have been unlikely to end with a trial-level decision. Whoever was aggrieved by the trial-level decision would have appealed, and *Moelis Supreme* establishes that Pubco would have prevailed before the Delaware Supreme Court.

---

[212] 914 A.2d 647; *see Moelis Merits*, 311 A.3d at 830, 852–55 (discussing *Sample*'s call for rejecting the Section 141(a) inquiry and evaluating contractual restrictions on board authority solely for fiduciary compliance); *Moelis Justiciability*, 310 A.3d at 1005–08 (same).

With the benefit of hindsight and after the result in *Moelis Supreme*, the plaintiff achieved results through the settlement on claims that could not have generated any benefit if litigated on the merits. The settlement made something out of nothing.

First, the settlement eliminated the Holders' ability to claim that they had the exclusive right to designate a majority of the board under the Pubco Board-Majority Right. The settlement also eliminated the Holders' ability to claim that the Holders could demand that the Pubco directors recommend in favor of their nominees, even if they believed their fiduciary duties required otherwise. The settlement ensured that Pubco's directors could instead make truthful and candid recommendations to stockholders about the director candidates.

Second, the settlement amended the Pubco Pre-Approval Requirements to introduce a fiduciary-out. Instead of the Holders having the ability to withhold pre-approval from and thereby block a list of corporate actions, the settlement provided the board with a way to proceed notwithstanding the Holders' opposition. The settlement also cut back on the scope of the Pubco Pre-Approval Requirements by (1) removing any pre-approval requirement for (1) the "hiring, termination, [or] replacement" of senior executives; (2) stockholder-initiated amendments to Pubco's bylaws; and (3) Pubco's entry into certain material new lines of business.

Through these amendments, the settlement ensured that if the Holders continued to sell their shares, then effective control over the Pubco board would pass

90

to its public stockholders. Because of the amendments, the Holders would no longer be able to use hard contractual power to enforce their wishes.

In exchange for Pubco's agreement to the amendments, the Class provided a tailored release encompassing only claims challenging the facial validity under Delaware law of: (i) any provision of the Pubco Agreement, as amended; (ii) a related section of Pubco's bylaws concerning director nominations; and (iii) the charter provision on director removal. The release did not encompass claims for breach of fiduciary duty, any as-applied challenges, or claims challenging any other provisions in Pubco's governing documents. That was a narrow give, balancing the limited get.

The settlement was negotiated at arm's length. Class plaintiff and class counsel adequately represented the class. The settlement falls within a range of reasonableness and is approved.

## F.    The Fee Award

Plaintiff's counsel seeks an all-in award of fees and expenses equal to $950,000. Pubco does not oppose that request.

"Under the 'common benefit' exception [to the general rule that a party must pay its own counsel fees], a litigant may . . . receive an award of attorneys' fees if: (a) the action was meritorious at the time it was filed, (b) an ascertainable group received a substantial benefit, and (c) a causal connection existed between the litigation and

the benefit."[213] The doctrine is "founded on the equitable principle that those who have profited from litigation should share its costs."[214] "Otherwise, 'persons who obtain the benefit of a lawsuit without contributing to its cost [freeriders] are unjustly enriched at the successful litigant's expense.'"[215] The power to award fees to counsel for creating a common benefit "is a flexible one based on the historic power of the Court of Chancery to do equity in particular situations."[216] When awarding fees, the court does not defer to what the defendants agreed not to oppose. The court "must make an independent determination of reasonableness."[217]

The *Sugarland* decision governs how a court awards fees in representative actions. That decision identified factors to consider when awarding fees, but the factors appeared diffusely throughout the opinion.[218] In *Americas Mining*, the Delaware Supreme Court summarized them as follows: "1) the results achieved; 2)

---

[213] *Dover Hist. Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006).

[214] *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996).

[215] *Id.* (alteration in original) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

[216] *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1166 (Del. 1989).

[217] *Goodrich*, 681 A.2d at 1046.

[218] *See Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149–50 (Del. 1980).

the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5) the standing and ability of counsel involved."[219]

The primary factor is the results achieved. If the results are quantifiable, then "*Sugarland* calls for an award of attorneys' fees based upon a percentage of the benefit."[220] "Hours worked are considered as a crosscheck to guard against windfall awards, particularly in therapeutic benefit cases."[221] "Secondary factors include the complexity of the litigation, the standing and skill of counsel, and the contingent nature of the fee arrangement together with the level of contingency risk actually involved in the case."[222] "Precedent awards from similar cases may be considered for the obvious reason that like cases should be treated alike."[223]

### 1. The Benefit Created By Counsel's Efforts

The primary factor in calculating a fee award is the benefit created by counsel's efforts. The causal dimension is critical, because Delaware public policy calls for compensating counsel "for the beneficial results they produced."[224] Counsel cannot take credit for results they did not produce, so a court must consider "whether the

---

[219] *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012).

[220] *Id.* at 1259.

[221] *Olson*, 2011 WL 704409, at *8.

[222] *Id.*

[223] *Id.*

[224] *Allied Artists Pictures Corp.*, 413 A.2d at 878.

93

plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof."[225] Here, counsel was the sole cause of the benefits conferred by the settlement.

*Americas Mining* calls for calculating an indicative fee as a percentage of the benefit conferred and for awarding an increasing percentage of the benefit as counsel pushes deeper into a case.[226] That approach has two beneficial effects.

First, awarding an increasing percentage helps counter a widely acknowledged conflict between the incentives of class and counsel:

> The plaintiff's financial interest is in his share of the total recovery less what may be awarded to counsel, *simpliciter*; counsel's financial interest is in the amount of the award to him less the time and effort needed to produce it. A relatively small settlement may well produce an allowance bearing a higher ratio to the cost of the work than a much larger recovery obtained only after extensive discovery, a long trial and an appeal.[227]

"When the lawyer gains 40 cents to the client's dollar, the lawyer tends to expend too little effort . . . . [H]e would not put in an extra $600 worth of time to obtain an extra $1,000 for his client, because he would receive only $400 for his effort."[228] Scholars who have long studied this conflict recommend awarding an increasing percentage of

---

[225] *In re Plains Res. Inc.*, 2005 WL 332811, at *3 (Del. Ch. Feb. 4, 2005).

[226] 51 A.3d at 1259.

[227] *Saylor v. Lindsley*, 456 F.2d 896, 900 (2d Cir. 1972) (Friendly, C.J.).

[228] *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986) (Easterbrook, J.).

the benefit as a rough corrective measure that "partially mitigates the attorney-client conflicts."[229]

Second, awarding a percentage that increases as the case progresses also counteracts a natural human tendency toward risk aversion. "For plaintiffs' counsel, risk aversion manifests itself as a natural tendency to favor an earlier bird-in-the-hand settlement that will ensure a fee, rather than pressing on for a potentially larger recovery for the class at the cost of greater investment and with the risk of no recovery."[230] "The promise of a larger potential share of the benefit nudges representative counsel's incentives towards greater alignment with the class or entity on whose behalf they are litigating."[231]

For cases that do not go the distance to a post-trial adjudication, *Americas Mining* provided guidelines:

> When a case settles early, the Court of Chancery tends to award 10–15% of the monetary benefit conferred. When a case settles after the plaintiffs have engaged in meaningful litigation efforts, typically including multiple depositions and some level of motion practice, fee

---

[229] Geoffrey P. Miller, *Some Agency Problems in Settlement*, 16 J. Legal Stud. 189, 201–02 (1987); *see* Alon Harel & Alex Stein, *Auctioning for Loyalty: Selection and Monitoring of Class Counsel*, 22 Yale L. & Pol'y Rev. 69, 71 (2004); Kevin M. Clermont & John D. Currivan, *Improving on the Contingent Fee*, 63 Cornell L. Rev. 529, 543–46 (1978); Murray L. Schwartz & Daniel J. B. Mitchell, *An Economic Analysis of the Contingent Fee in Personal-Injury Litigation*, 22 Stan. L. Rev. 1125, 1133–39 (1970).

[230] *In re Orchard Enters., Inc. S'holder Litig.*, 2014 WL 4181912, at *8 (Del. Ch. Aug. 22, 2014).

[231] *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1071 (Del. Ch. 2015).

awards in the Court of Chancery range from 15–25% of the monetary benefits conferred.[232]

Selecting an appropriate percentage requires an exercise of judicial discretion.[233] The test is not a mechanical one, but the use of guideline ranges promotes consistent awards so that similar cases are treated similarly. Past precedents shape future behavior, and a practice of rarely departing from guideline percentages helps create desirable incentives.[234]

If there are credible proxies that allow the court to reach an approximate quantification, then the court should use those and apply the percentage-of-the-benefit test. Eliminating or modifying contractual pre-approval requirements or board composition provisions effectively transfers a portion of the counterparty's control over the corporation to the public stockholders. In doing so, it makes the public stockholders' voting rights more valuable. The value afforded to voting rights therefore provides a rough yet credible proxy.

Some scholars have valued voting rights by comparing the trading prices of high-vote shares to low-vote shares. Studies based on U.S. firms imply values of

---

[232] 51 A.3d at 1259–60 (footnote omitted).

[233] *Id.* at 1261.

[234] *In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679, 695 (Del. Ch. 2023), *aff'd*, 326 A.3d 686 (Del. 2024).

2%,[235] 3.6%,[236] 5.4%,[237] and 10.5%[238] of total equity value. Other scholars have valued voting rights by examining the prices at which large blocks of stock trade relative to the prices at which individual shares trade. Studies based on U.S. firms imply values of 1%,[239] 2.4%,[240] 4.3%,[241] and in a subset of banks between 1964 and 1975, 26%[242] of total equity value.

Perhaps the most interesting method of valuing voting rights compares the market price of a share of common stock with the implied market price of a synthetic share of non-voting stock constructed using matching put and call options.[243] The

---

[235] Tatiana Nenova, *The Value of Corporate Voting Rights and Control: A Cross-Country Analysis*, 68 J. Fin. Econ. 325 (2003).

[236] Paul Docherty, Steve Easton & Sean Pinder, *Flights-to-Control: Time Variation in the Value of a Vote*, 66 J. Corp. Fin. 101790 (2021).

[237] Ronald C. Lease, John J. McConnell & Wayne H. Mikkelson, *The Market Value of Control in Publicly-Traded Corporations*, 11 J. Fin. Econ. 439 (1983).

[238] Luigi Zingales, *What Determines the Value of Corporate Votes?*, 110 Q. J. Econ. 1047 (1995).

[239] Alexander Dyck & Luigi Zingales, *Private Benefits of Control: An International Comparison*, 59 J. Fin. 537 (2004).

[240] *See* Saeyoung Chang & David Mayers, *Who Benefits in an Insider Negotiated Block Trade?*, 41 Fin. Mgmt. 703 (2012).

[241] Michael J. Barclay & Clifford G. Holderness, *Private Benefits From Control of Public Corporations*, 25 J. Fin. Econ. 371 (1989).

[242] Larry G. Meeker & O. Maurice Joy, *Price Premiums for Controlling Shares of Closely Held Bank Stock*, 53 J. Bus. 297 (1980).

[243] Avner Kalay, Oğuzhan Karakaş & Shagun Pant, *The Market Value of Corporate Votes: Theory and Evidence from Option Prices*, 69 J. Fin. 1235 (2014).

main advantage of that method is to enable an expert to estimate the value of voting rights for a particular issuer at a particular time. As expected, the implied value of a voting right fluctuates depending on the proximity of a vote, with the right to vote generally having no value but spiking upwards as the time of exercise approaches. Scholars using this method find valuations consistent with the low end of prior studies[244] and an average value for votes equal to approximately 1.58% of the stock price.[245]

In *Mosaic*, the court reviewed this literature when assessing a settlement restricting the voting rights associated with high vote stock and valued the restrictions at 3.5% of equity value.[246] When considering another settlement, the court surveyed the court's decisions concerning fee awards in control-related cases and noted that they implicitly recognized that "1 to 5 percent [of market capitalization] is a measure of the ambient value of control."[247]

---

[244] Edward Fox, *Is There A Delaware Effect for Controlled Firms?*, 23 U. Pa. J. Bus. L. 1, 21 (2020).

[245] Morgan White-Smith, *Revisiting* Revlon*: Should Judicial Scrutiny of Mergers Depend on the Method of Payment?*, 79 U. Chi. L. Rev. 1177, 1191 (2012) (discussing earlier, unpublished version of Kalay, Karakaş, and Pant's analysis).

[246] *In re The Mosaic Co. S'holder Litig.*, C.A. No. 6228, at 48–51 (Del. Ch. Sept. 15, 2011) (TRANSCRIPT).

[247] *In re Expedia Gp. S'holders Litig.*, Consol. C.A. No. 2019-0494, at 39 (Del. Ch. Jan. 19, 2022) (TRANSCRIPT).

After *Moelis Merits*, the trial court used this method to value the benefit conferred and quantify an award. The Moelis Agreement gave Partners complete control over the corporation, and the plaintiff convinced the court to invalidate all of the Moelis Pre-Approval Requirements and three of the board covenants. That outcome effectively delivered control to the public stockholders. Moelis's market cap was approximately $3.56 billion, so 1 to 5% of that amount ranged from $35.6 to $178 million. The 3.5% figure used in *Mosaic* equated to a benefit of approximately $124.6 million. The plaintiff sought a fee of $6 million, reflecting roughly 17% of the low-end benefit, 3.4% of the high-end benefit, and 4.8% of the benefit using the 3.5% figure. Plaintiff's counsel prevailed on the merits but did so early in the case after moving for summary judgment, warranting 10 to 15% of the benefit. The court admitted envisioning a fee in the vicinity of $3 million before reading the parties' papers, but found the plaintiff's ask to be well supported and the defendant's counter of a fee between $450,000 and $600,000—in the neighborhood of a disclosure-only settlement during the M&A litigation epidemic—as wholly unreasonable. The court also reviewed prior awards and found the plaintiff's request to be in line with precedent. The court approved the $6 million award.[248]

The court took a similar approach in *Seavitt*. The corporation had a market cap of $2.39 billion, so 1% equated to a benefit of $23.9 million, 3.5% equated to $83.65

---

[248] *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, C.A. No. 2023-0309, at 52–61 (Del. Ch. July 18, 2024) (TRANSCRIPT). Because *Moelis Supreme* reversed the trial-level outcome on the basis of laches, the fee award was vacated.

million, and 5% equated to $119.5 million. That too was an early-stage victory after a motion for summary judgment, warranting 10 to 15% of the benefit. Using the 3.5% figure to quantify the benefit, that suggested a fee of $8.37 to $12.55 million. *Seavitt* was issued after *Moelis Justiciability* and *Moelis Merits*, but the briefing and argument took place before those decisions. *Seavitt* also involved issues not raised in *Moelis*. The plaintiff sought a fee of $4 million. The court approved a fee of $2.3 million.[249] The parties subsequently settled the case in exchange for reducing the fee award to $1.75 million.[250]

The court again took a similar approach in *Wagner*. The corporation had a market cap of $5.76 billion, so 1% would equate to a benefit of $57.6 million, 3.5% equated to $201.6 million, and 5% equated to $288 million. *Wagner* was another early-stage victory, this time after a motion for judgment on the pleadings, warranting 10 to 15% of the benefit. Using the 3.5% figure to quantify the benefit suggested a range for a reasonable fee of $20.16 to $30.24 million. Using the low end of both ranges would result in a fee of $5.76 million. The plaintiff sought $5 million, then reduced her request to $3.5 million. The court placed significant weight on the *N-Able*

---

[249] *Seavitt v. N-Able, Inc.*, C.A. No. 2023-0326, at 19–29 (Del. Ch. Dec. 2, 2024) (TRANSCRIPT).

[250] *Seavitt*, C.A. No. 2023-0326, Dkt. 53.

precedent while noting that the *Wagner* plaintiff achieved greater relief. The court awarded a fee of $2.4 million.[251]

In this case, Pubco's market capitalization was approximately $2.83 billion, so 1% would equate to a benefit of $28.3 million, 3.5% would equate to $99 million, and 5% would equate to $141.5 million. The plaintiff did not achieve a judgment and settled early in the case, warranting no more than 10% of the benefit. Using 3.5% as an indicative value of control, that would suggest a ceiling of $9.9 million. At the same time, the settlement in this case did not accomplish as much as the victories in *Moelis*, *Seavitt*, or *Wagner*, pointing to a lower award. The plaintiff's requested fee of $950,000 works out to 1% of the theoretical benefit and 10% of the award that the benefit would imply. That is a reasonable request under the control-based approach and in light of precedent cases.

In assessing the benefit that plaintiff's counsel conferred, some recognition also must be given to the lessons learned as a result of the litigation effort.[252] Plaintiff's counsel litigated this case, *Moelis*, and *Seavitt* (different counsel litigated *Wagner*) to address what plaintiff's counsel saw as a widespread problem involving governance agreements.

---

[251] *Wagner v. BRP Gp., Inc.*, C.A. No. 2023-0150, at 48–67 (Del. Ch. Jan. 22, 2025) (TRANSCRIPT).

[252] *In re Tesla, Inc. Deriv. Litig.*, 351 A.3d 1005, 2025 WL 3689114, at *18 n.169 (Del. Dec. 19, 2025) (TABLE) (citing precedent which took into account that "lessons were learned" when determining a fee award; approving award of approximately $54 million despite plaintiff only recovering nominal damages of $1).

Plaintiff's counsel did the most work in *Moelis* and *Seavitt*. The litigation effort in *Moelis* produced the Delaware Supreme Court's decision in *Moelis Supreme*, which made highly beneficial changes to the test for voidness under Delaware law. That litigation effort also prompted the statutory validation of governance agreements through the Governance Agreement Amendment. Those are significant benefits conferred for Delaware's corporate law ecosystem.

Plaintiff's counsel did not receive any compensation for the benefits achieved in *Moelis Supreme*. Plaintiff's counsel received $1,750,000 for the relief in *Seavitt*. The requested award of $950,000 is reasonable based on the benefits conferred in this case alone. The aggregate award of $2,700,000 is also reasonable across this case, *Moelis*, and *Seavitt* in light of the broader benefits that plaintiff's counsel generated.

### 2.     The Time And Effort Of Counsel

Another key factor is the time and effort expended by counsel. This factor serves as a cross-check on the reasonableness of a fee award.[253]

Plaintiff's counsel spent 557 hours researching, investigating, and litigating this case through the date of settlement. According to counsel's affidavits, the value of that time at customary rates would be $426,239.25. Plaintiff's counsel also incurred expenses of $4,630.56. Ignoring the immaterial expenses, the requested award of $950,000 represents a multiplier of 2.2 times lodestar and an implied rate of $1,706 per hour.

---

[253] *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1138 (Del. Ch. 2011).

Neither is excessive under this court's precedents. Plaintiff's counsel cannot expect to win every case. The award for a successful recovery must therefore take into account its riskiness.

The portfolio-based approach that plaintiff's counsel took also warrants consideration. If plaintiff's counsel pursues similar claims on a portfolio basis, the fee awards should account for that. Otherwise, plaintiff's counsel might receive windfall compensation by securing a victory in one case, then leveraging it against other issuers.

Here, the same lawyers litigated this case, *Moelis*, and *Seavitt*. Plaintiff's counsel lost big in *Moelis*, prevailed in *Seavitt*, and settled this case. In the fee petition in *Moelis*, plaintiff's counsel claimed 480.5 hours and a total lodestar of $378,973.75, plus immaterial expenses of approximately $7,000.[254] That was before plaintiff's counsel expended additional hours attempting unsuccessfully to defend the judgment on appeal. In the fee petition in *Seavitt*, plaintiff's counsel claimed 677 hours and a total lodestar of $598,038.75, plus immaterial expenses of around $7,000.[255]

In total, plaintiff's counsel incurred 1,714.5 hours across all three cases for an aggregate lodestar of $1,403,252. If the court approves the unopposed request for $950,000 in this case, the aggregate fee award across all three cases will be $2,700,000, reflecting a multiplier of 1.92 times lodestar and an implied rate of $1,575

---

[254] *Moelis*, C.A. No. 2023-0309, Dkt. 35, Ex. 7.

[255] *Seavitt*, C.A. No. 2023-0326, Dkt. 39.

per hour. On the defense side, where many big city practitioners bill close to or more than $3,000 per hour, that would equate to a junior partner's rate. It falls within a range of reasonableness and does not require an adjustment.

### 3. The Extent To Which The Fee Was Contingent On Results

The next factor to be considered is the extent to which counsel litigated on contingency.[256] It is the "public policy of Delaware to reward this risk-taking in the interests of shareholders."[257] Accepting contingency risk is what enables counsel to receive an award based on the results generated by the litigation that exceeds their lodestar. When counsel does not litigate on contingency, then counsel cannot receive more than their actual billings and expenses, and if the results-based award under *Sugarland* calls for less, then they receive less.

That said, "[n]ot all contingent cases involve the same level of contingency risk."[258] During the epidemic of M&A litigation, for example, some lawyers filed cases and sought expedited pre-closing injunctive relief in a setting where the desire to close the transaction put pressure on the defendants. There was also a ready-made settlement opportunity that took the form of supplemental disclosures or minor transactional tweaks.[259] Those cases did not involve real contingency risk.

---

[256] *Activision*, 124 A.3d at 1073–74.

[257] *Plains Res.*, 2005 WL 332811, at *6.

[258] *Activision*, 124 A.3d at 1073.

[259] *See Orchard Enters.*, 2014 WL 4181912, at *9.

104

Here, plaintiff's counsel litigated on a fully contingent basis. If they lost, as in *Moelis*, then they would get nothing. This case also involved true contingency risk. Plaintiff's counsel did not enter the case with a ready-made exit or obvious settlement opportunity.

The true contingency risk in this case supports an award above lodestar. No further adjustment is warranted under this factor.

### 4. The Complexity Of The Litigation

"One of the secondary *Sugarland* factors is the complexity of the litigation. All else equal, litigation that is challenging and complex supports a higher fee award."[260] Like *Moelis*, *Wagner*, and *Seavitt*, this case presented the type of challenging and complex issues that the court regularly addresses. No adjustment is warranted under this factor.

### 5. The Standing And Ability Of Counsel

No one disputes the standing or ability of counsel. No adjustment is warranted here either.

### 6. The Overall Conclusion

The *Sugarland* factors support the requested all-in award of $950,000.

## G. The Incentive Award

Finally, plaintiff's counsel asks the court to approve an incentive award of $5,000 for the named plaintiff, to be paid out of the fee award, as restitution for the

---

[260] *Activision*, 124 A.3d at 1072.

time and effort the plaintiff devoted to this action. The Delaware Supreme Court has recognized that a class representative can receive an incentive fee based on (i) the time, effort, and expertise expended by the class representative, and (ii) the benefit to the class.[261] Pubco takes no position on the incentive award.

Public policy favors incentive awards in appropriate circumstances: "Compensating the lead plaintiff for efforts expended is not only a rescissory measure returning certain lead plaintiffs to their position before the case was initiated, but an incentive to proceed with costly litigation (especially costly for an actively participating plaintiff) with uncertain outcomes."[262] Scholars have provided sound reasons for the Delaware courts to move beyond purely restitution-oriented awards and for expanding, rather than restricting, the payment of incentive fees, albeit with criteria to minimize agency costs and avoid windfalls.[263] Incentive awards are common in the federal courts, where scholars have expressed strong support for them, particularly when they reward sophisticated investors for performing a meaningful monitoring function and adding value for the class.[264]

---

[261] *Raider v. Sunderland*, 2006 WL 75310, at *1 (Del. Ch. Jan. 4, 2006), *cited in Isaacson v. Niedermayer*, 200 A.3d 1205, 1205 n.1 (Del. 2018).

[262] *Id.* (footnote omitted).

[263] *See* Charles R. Korsmo & Minor Myers, *Lead Plaintiff Incentives in Aggregate Litigation*, 72 Vand. L. Rev. 1923 (2019).

[264] *See, e.g.*, Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1308–10, 1319–20 (2006); 5 William B. Rubenstein et al., *Newberg and Rubenstein on Class Actions*

A restitution-based award necessarily includes out-of-pocket costs, but it must go beyond that to fulfill its mission. A representative plaintiff must devote time to the litigation, and if that time has to be offered *gratis*, then the representative plaintiff effectively pays for taking on the role of class representative. Rather than receiving the same amount as the class, the named plaintiff receives less.

Nor is serving as a representative plaintiff an easy task. In the current litigation environment, a stockholder who files plenary litigation faces "the very real possibility of having their computer and other electronic devices imaged and searched, sitting for a deposition—perhaps more than one if they also institute [Section] 220 litigation—and then perhaps testify at trial."[265] A named plaintiff also accepts reputational risk.[266]

---

§ 17:4 (6th ed.), Westlaw (database updated June 2026). The exception is federal securities actions, where they are prohibited by statute. 15 U.S.C. § 78u-4(a)(4). Scholars have criticized this prohibition as running contrary to the incentive structure crafted by the Private Securities Litigation Reform Act of 1995 and as having deleterious and unintended consequences for the role of sophisticated investors in supervising class actions. *See* Richard A. Nagareda, *Restitution, Rent Extraction, and Class Representatives: Implications of Incentive Awards*, 53 UCLA L. Rev. 1483, 1491 (2006); Eisenberg & Miller, *supra*, at 1348–49; Charles Silver & Sam Dinkin, *Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions*, 57 DePaul L. Rev. 471, 481 (2008).

[265] *Verma v. Costolo*, C.A. No. 2018-0509, at 52–53 (Del. Ch. July 27, 2021) (TRANSCRIPT); *accord Voigt v. Metcalf*, C.A. No. 2018-0828, at 44–45 (Del. Ch. Jan. 19, 2022) (TRANSCRIPT).

[266] *See* Korsmo & Myers, *supra*, at 1938–40.

Here, plaintiff's counsel seeks leave to pay a modest incentive award of $5,000. The requested award will be paid out of the fee award, which is customary. The incentive award is "not so large as to raise specters of conflicts of interest or improper lawyer-client entanglements."[267]

## III. CONCLUSION

After *Moelis Supreme*, there are no voidness problems with any of the provisions in the Pubco Agreement, enabling the settlement to be approved. Under *Wagner Supreme*, the complaint nevertheless remained meritorious when filed. The Class is certified, and the settlement falls within a range of reasonableness. The all-in fee is reasonable, and the incentive award is appropriate. The court will enter a separate order confirming its approval of the settlement, fee award, and incentive award.

---

[267] *See Orchard Enters.*, 2014 WL 4181912, at *13.